UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

**FILED**

FEB 1 0 2006

U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTH ATLANTIC DISTRIBUTION, INC. | : | |
| AND MICHAEL MIRANDA, | : | |
| Plaintiffs, | : | |
| | : | |
| V. | : | C.A. NO: 05-348L |
| | : | |
| TEAMSTERS LOCAL UNION NO. 430, | : | |
| TEAMSTERS LOCAL UNION NO. 776, | : | |
| DANIEL A. VIRTUE *in his capacity as* | : | |
| *President of Teamsters Local Union No. 776* | : | |
| AND JOHN L. FOGLE *in his capacity as* | : | |
| *Secretary of Teamsters Local Union No. 776,* | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS NORTH ATLANTIC DISTRIBUTION, INC. AND MICHAEL MIRANDA'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION ............................................................. 1

II.  FACTS AND TRAVEL .................................................... 2

III. ARGUMENT.................................................................. 5

    A.    <u>NORAD And Miranda Have A Constitutional Right To Due Process</u> 7

    B.    <u>No Court Of Equity Will Enforce The Penalty Which Local 430 Is Pursuing</u>....................................................................14

        1.    The Substance Of The Claims Asserted By Local 430 Against NORAD And Miranda Represents An Unenforceable Penalty ..............................................................14

            a.  The Harm Caused By A Breach Of The CBA Was Susceptible To Precise Mathematical Calculation And In Fact Was Precisely Calculated .............................15

            b.  The Amount Fixed In The Liquidated Damages Provision Does Not Represent A Reasonable Forecast Of Just Compensation For The Harm Caused.............................17

        2.    Local 430's Counterclaims Are Actions In Equity Not Law....19

            a.  Numerous Federal And State Courts Have Held That Alter Ego Liability Is Equitable.......................................20

            b.  The Remedy Sought By Local 430 Is Equitable...............23

            c.  Any Reliance Upon Cases Ruling That Piercing The Corporate Veil Is An Action At Law (Explicitly or Implicitly) Is Misplaced ....................................................23

        3.    An Unconscionable Result Will Not Be Permitted In A Court Of Equity ................................................................27

IV. CONCLUSION ...........................................................28

i

## I. INTRODUCTION

Michael Miranda ("Miranda") is the President and sole shareholder of two corporations, North Atlantic Distribution, Inc. ("NORAD") and North Atlantic Transport Company of Rhode Island ("NATCO"). On June 9, 2005, Teamsters Local Union No. 430 ("Local 430")[1] advised Miranda and NORAD that it was seeking to enforce a default judgment (previously obtained against NATCO) against NORAD and possibly Miranda based upon the "single employer" doctrine. The default judgment which had been obtained against NATCO on February 28, 2003 in the United States District Court for the Middle District of Pennsylvania (C.A. No. 02-1461) (the "Pennsylvania Action"), was based upon an alleged underlying debt of exactly $27,513.28 as of October 26, 2001, which had, according to Local 430, grown to in excess of $1,810,586.30 by June 9, 2005. The increase was the result of a so-called "liquidated damages" provision in Local 430 and NATCO's collective bargaining agreement ($1,529.28 per day as calculated by Local 430).

But for the fact of default, judgment in the Pennsylvania Action never would have been entered. The great bulk of the judgment was not "liquidated damages" but instead, was unenforceable punitive damages. While Local 430 may be perfectly free to argue as against Miranda and/or NORAD that they have liability on the underlying claims, it cannot enforce the judgment against

---

[1] Plaintiffs refer to all defendants collectively as Local 430.

Miranda or NORAD without allowing them to litigate any question beyond their relation to NATCO.[2]

## II. FACTS AND TRAVEL

NATCO and Local 430 were parties to a 280-page, pre-printed, collective bargaining agreement ("CBA") for the period beginning June 1, 1999 through May 31, 2003, which covered NATCO's Pennsylvania workers and which contained the following provision:

> ARTICLE 15.
>
> SEPARATION OF EMPLOYMENT
>
> (a) Upon discharge or upon permanent terminal closing, the Employer shall pay all wages, including vacation pay, in no more than seventy-two (72) hours, excluding Saturdays, Sundays and holidays, due to the employee at the time of discharge or permanent terminal closing. Failure to pay within seventy-two (72) hours of discharge shall subject the Employer to pay liquidated damages in the amount of eight (8) hours pay for each day of delay.

See attached "Exhibit A." See also, Miranda Aff. ¶5 attached as "Exhibit B."

On October 26, 2001, NATCO largely ceased operations at its York, Pennsylvania terminal due to lack of business. Miranda Aff. ¶6. A few months thereafter, it terminated its Rhode Island operations for the same reason. Miranda Aff. ¶7. Local 430 filed a grievance against NATCO on November 9, 2001 which requested that its members be paid for earned wages, vacation time, sick time and personal days. See attached "Exhibit C" as authenticated and admitted in Defendants' Answer ¶13. Local 430's grievance also sought

---

[2]  NATCO is not a party in the case at bar and whether or not the judgment in the Pennsylvania Action is enforceable against NATCO is not before this Court.

so-called "liquidated damages" pursuant to Article 15 of the parties' CBA. See attached "Exhibit C." The grievance was submitted to an arbitration panel on May 22, 2002 at which time Local 430's claims were upheld by default due to NATCO's failure to appear at the arbitration. See attached "Exhibit D" as authenticated and admitted in Defendants' Answer ¶14. The arbitration panel's decision did not reference any specific dollar amount of damages. See attached "Exhibit D."

On August 21, 2002, Local 430 filed an action against NATCO in the United States District Court for the Middle District of Pennsylvania (C.A. No. 02-1461) to enforce the arbitration panel's decision (the "Pennsylvania Action"). See attached "Exhibit E" as authenticated and admitted in Defendants' Answer ¶15. The Pennsylvania Action sought, among other things, an order directing NATCO to pay the grievants' unused/earned vacation pay, sick time, personal days, and down time. See attached "Exhibit E." On February 24, 2003, Local 430 filed a Request For Default Judgment in the Pennsylvania Action as a result of NATCO's failure to answer the Pennsylvania Action which sought $27,513.28 for vacation time, unused sick days, personal days, and down time which were owed to ten of its members and $441,446.40 related to liquidated damages, plus costs and attorney's fees.[3] See attached "Exhibit G" as authenticated and admitted in Defendants' Answer ¶16.

---

[3] The Request to Enter Default also sought $46,606.96 related to pension and health and welfare payments due. Plaintiffs previously contended that this portion of the judgment was satisfied by virtue of a settlement entered into between NATCO and the pension and health and welfare funds. Plaintiffs' Complaint ¶18. Local 430 has acknowledged that it will not be pursuing recovery of the $46,606.96. See attached "Exhibit F." See also, Miranda Aff. ¶12.

On February 28, 2003, judgment was entered in the Pennsylvania Action in favor of Local 430 and against NATCO in the amount of $516,815.59 as of February 14, 2003 plus $1,529.28 per day for "liquidated damages until the claim is paid pursuant to Article 15 of the National Master Automobile Transporters Agreement."[4] <u>See</u> attached "Exhibit H" as authenticated and admitted in <u>Defendants' Answer</u> ¶17.  The judgment entered in the Pennsylvania Action was registered in the United States District Court for the District of Rhode Island (Misc. 05-006L) on January 7, 2005.  On June 9, 2005, Local 430 advised NORAD and Miranda, for the very first time, that it was seeking to enforce the default judgment in the Pennsylvania Action (previously obtained against NATCO) against NORAD and possibly Miranda based upon the "single employer" doctrine. <u>See</u> attached "Exhibit I." <u>See also</u>, <u>Miranda Aff.</u> ¶8.  In addition, Local 430 advised NORAD and Miranda that the judgment had purportedly grown to in excess of $1,810,586.30, exclusive of interest, as of June 9, 2005. <u>See</u> attached "Exhibit I." <u>See also</u>, <u>Miranda Aff.</u> ¶9.  Thereafter, NORAD sent checks to Local 430 amounting to $42,931.25 to satisfy all monies allegedly due to Local 430, excluding liquidated damages.[5]

---

[4] The undersigned do not represent NATCO, which is not a party to this action.  Whether this judgment is enforceable against NATCO is irrelevant to NORAD and Miranda's Motion for Summary Judgment.

[5] NORAD issued two checks to Local 430 which have been cashed.  The first check was issued on August 12, 2005 in the amount of $30,000.00 which mirrors Local 430's Request for Default Judgment and was broken down as follows: 1. $27,360.00 for Local 430 grievance No. 58622; 2. $153.28 for Local 430 Grievance No. 56468; 3. $1,249.95 for court costs, service fees and attorney's fees; and 4. $1,236.77 representing post-judgment interest at the rate of 1.3% compounded annually in accordance with 28 U.S.C. §1961.  In what was almost certainly an excess of caution, NORAD issued a second check on August 22, 2005 in the amount of $12,931.25 which represented 12% interest on Local 430's "claim" for the period beginning October 1, 2001 through August 31, 2005. See checks attached as "Exhibit J." <u>Miranda Aff.</u> ¶10.

<u>Miranda</u> <u>Aff.</u> ¶10.  NORAD made this payment in an attempt to satisfy Local 430's claim and consequently to stop any further accrual of the so-called liquidated damages while at the same time denying any liability. <u>Miranda</u> <u>Aff.</u> ¶11.

Plaintiffs filed the present Complaint for Declaratory Judgment (C.A. No. 05-348L), on August 16, 2005 which seeks, among other things, a declaration regarding whether NORAD and/or Miranda are responsible to satisfy in whole or in part, the judgment entered against NATCO in the Pennsylvania Action. Local 430 filed an answer which asserted three counterclaims against NORAD and/or Miranda on September 30, 2005, requesting that this Court declare that NORAD and/or Miranda are alter egos and/or constituted a single employer of NATCO and that Miranda and/or NORAD are liable to satisfy the judgment in the Pennsylvania Action.

### III.    ARGUMENT

The Limited liability of corporations is not a mere technicality:

> The policy of our law today sanctions incorporation
> with the consequent immunity from individual liability.
> It follows that no fraud is committed in incorporating
> for the precise purpose of avoiding and escaping personal
> responsibility.  Indeed, that is exactly why most people
> incorporate, and those dealing with corporations know,
> or at least are presumed to know, the law in this regard.

4 Stephen B. Presser, <u>Piercing the Corporate Veil</u> § 1:1 at 5 (3$^d$ ed. 2004), <u>citing</u> M. Wormser, <u>Disregard of the Corporate Fiction and Allied Corporations Problems</u> (New York: Baker, Voorhis and Co. 1927).  Presser goes on to explain the importance of limited liability:

5

> In the early part of the century it could be said by
> no less a personage then the President of Columbia
> University that: "The limited liability corporation is
> the greatest single discovery of modern times [and that]
> even steam and electricity are far less important than
> the limited liability corporation..."

Id. (Citations omitted).  Federal cases dealing with piercing the corporate veil

have ruled that "a corporate entity may be disregarded in the interests of public

convenience, fairness and equity." Brotherhood of Locomotive Engineers v.

Springfield Terminal Railway Co., 210 F.3d 18, 26 (1st Cir. 2000), citing Town

of Brookline v. Gorsuch, 667 F.2d 215, 221 (1st Cir. 1981).  Local 430's claims

against NORAD and Miranda seek a contrary result – to enforce an

unenforceable penalty which metastasized from $28,000.00 to almost

$2,000,000.00 before Local 430 made any allegation that NORAD and/or

Miranda were being pursued to satisfy the judgment.

The two issues before this Court are:  1) whether the default judgment

obtained against NATCO in the Pennsylvania Action can subsequently be

enforced against NORAD and/or Miranda without providing NORAD and

Miranda an opportunity to litigate anything but their status as an alleged alter

ego and/or single employer?[6] and 2) whether a Court of equity will enforce a

judgment, the underlying basis of which is an unenforceable penalty, against a

---

[6] Whether plaintiffs are alter egos of NATCO or whether they constitute a single employer are
obviously questions of fact.  For the purpose of the within Motion – and only for such purpose
since Plaintiffs will urge in the event of further proceedings beyond their Motion for Summary
Judgment that they are not alter egos, single employers or subject to the doctrine of piercing
the corporate veil - Plaintiffs argue that even if they were alter egos of NATCO there is no
liability on the judgment.  The crux of Plaintiffs' Motion for Summary Judgment is that the
Pennsylvania Action default judgment is unenforceable as to NORAD and Miranda as a matter
of law (without litigation of the underlying merits of Local 430's dispute with NORAD and
Miranda) even if Local 430 ultimately proves that NORAD and/or Miranda were alter egos of
NATCO or that NORAD, Miranda and NATCO constituted a single employer.

non-party to the original action who had never been alerted to the possibility that alter ego or single employer liability would subsequently be asserted?

Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides, "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). This Court must view all evidence in the light most favorable to the non-moving party. Springfield Terminal Ry. Co. v. Canadian Pac. Ltd., 133 F.3d 103, 106 (1st Cir. 1997). Summary judgment is inappropriate when the facts offered by the moving party seem more plausible than the non-moving party or where it is unlikely that the non-moving party will prevail at trial. Gannon v. Narragansett Elec. Co., 777 F. Supp. 166, 169 (D.R.I. 1991). However, summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. Blackie v. Main, 75 F.3d 716, 721 (1st Cir. 1996).

A.   NORAD And Miranda Have A Constitutional Right To Due Process

Local 430 is requesting that this Court declare that the default judgment entered in the Pennsylvania Action (only against NATCO) is binding upon NORAD and Miranda upon a finding that NORAD and Miranda are alter egos of and/or single employers with NATCO, without any litigation regarding the underlying merits of Local 430's claims. Local 430's counterclaims must be dismissed as a matter of law because its requested relief will violate NORAD

7

and Miranda's constitutional right to due process. NORAD and Miranda have not had a full and fair opportunity to defend the underlying merits of Local 430's claims because Local 430 waited almost 2 ½ years after the Pennsylvania Action concluded to assert for the first time that NORAD and Miranda were being pursued under theories of alter ego liability and/or the single employer doctrine.

The Fifth Amendment of the United States Constitution provides that "no person shall...be deprived of life, liberty, or property, without due process of law."[7] U.S. Const. Amend. V. The United States Supreme Court has ruled that "it is a **violation of due process** for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard." Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 327, 99 S.Ct. 645, 649 (1979). (Emphasis added).

Due process analysis is necessary before res judicata[8] may be invoked so as to "preclude[s] the parties or their privies from relitigating issues that were

---

[7] "[A] corporation is entitled to due process, Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), and equal protection, Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985), of law. Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 285, 109 S.Ct. 2909, 2925, 106 L.Ed.2d 219, 285 (1989).

[8] The United States Supreme Court has described the relationship between due process and res judicata as follows: "'The doctrine of res judicata rests at bottom upon the ground that the party to be affected, or some other with whom he is in privity, has litigated or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction. The opportunity to be heard is an essential requisite of due process of law in judicial proceedings. And as a State may not, consistently with the Fourteenth Amendment, enforce a judgment against a party named in the proceedings without a hearing or an opportunity to be heard, so it cannot, without disregarding the requirement of due process, give a conclusive effect to a prior judgment against one who is neither a party nor in privity with a party therein.'" Richards v. Jefferson County, Alabama, 517 U.S. 793, 797, 116 S.Ct. 1761, 1765, 135 L.Ed.2d 76, fn. 4. (1996).

or could have been raised [in a civil action]."[9] Gonzalez v. Banco Central Corp., 27 F.3d 751, 755 (1st Cir. 1994), citing Allen v. McMurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980).  The First Circuit Court of Appeals has explained that the doctrine of res judicata "rests upon the bedrock principle that, for claim preclusion to apply, a litigant first must have had a full and fair opportunity to litigate his claim." Gonzalez, 27 F.3d at 758, citing Fiumara v. Fireman's Fund Ins. Cos., 746 F.2d 87, 92 (1st Cir. 1984).

The Restatement of Judgments, balancing the right to due process and the application of res judicata, addresses the very issue before this court (i.e. whether a judgment against a corporation is binding upon an alter ego of that corporation) and concludes that liability will only attach if the alter ego is given notice that such liability is sought to be imposed and a fair opportunity to defend the action:

> A judgment against a corporation that is found to be the alter ego of a stockholder or member of the corporation establishes personal liability of the latter **only if he is given notice that such liability is sought to be imposed and fair opportunity to defend the action** resulting in the judgment.

Restatement (Second) of Judgments § 59(5) (1982). (Emphasis added).

Several courts have followed this principle by considering cases with facts virtually identical to the case at bar and concluding that it is a **violation of**

---

[9] Collateral estoppel has no effect upon the case at bar because "when judgment is issued as a result of a default...the underlying issues have not been actually litigated.  For that reason, a **default judgment cannot serve to preclude the litigation of issues under the doctrine of collateral estoppel.**" Lee v. U.S., 124 F.3d 1291, 1296 (Fed. Cir. 1997), citing Schendel v. Curtis, 83 F.3d 1399, 1405 (Fed.Cir. 1996); Restatement (Second) of Judgments § 27 cmt. e (1982); 18 James Wm. Moore, Moore's Federal Practice, § 132.03[2][k] (3d ed.1997). (Emphasis added).

**due process to enforce a default judgment** (obtained against a corporation) against the corporation's **subsequently alleged alter ego** without allowing the alleged alter ego an opportunity to litigate questions involving underlying liability and instead limiting the litigation to the corporate relationships.

In Motores De Mexicali S.A. v. Superior Court, 51 Cal.2d 172, 176, 331 P.2d 1, 3 (Cal. 1958), the Supreme Court of California ruled that the enforcement of a default judgment (obtained against a corporation) against the corporation's alleged alter egos without allowing them to litigate any questions beyond their relation to the allegedly alter ego corporation would be a patent violation of the alter egos' due process rights. In Motores De Mexacali, "a judgment by default in the amount of $26,900.83, plus interest and costs, was entered against Erbel, Inc., as 'a California corporation, individually, and doing business under the fictitious name of Bi Rite Auto Sales.'" Id. at 173, 2. Following entry of the default judgment, the plaintiff filed a petition claiming that the corporation was merely an alter ego of three individuals and that the default judgment should be amended to add the individuals as judgment creditors:

> The corporation known as Erbel, Inc., was under their full control and management, and was simply being used by them as a means for diverting the revenues of the business to themselves as salaries and loan repayments while at the same time avoiding any personal liability for the obligations of the business. ...**The petition concluded with the assertion that Resnick and the two Cowans operated Erbel, Inc., merely as their alter ego,** and that they should thus be held individually liable for the debts of the business conducted under the fictitious name of Bi Rite Auto Sales. To accomplish this, it was **requested that they**

10

> **be made judgment debtors** under the judgment
> previously entered against Erbel, Inc.

Id. at 174, 2. (Emphasis added). The Court rejected the plaintiff's attempt to

rely upon two cases which were actually litigated and ruled, "Instead, the

judgment was entered against Erbel, Inc., **strictly by default**." Id. at 176, 3.

(Emphasis added). Finally, the Court held that the addition of the three

individuals as judgment debtors (to a judgment obtained by default) without

allowing them to litigate any questions beyond their alter ego status would

constitute denial of due process:

> Further, the same facts which serve to distinguish the
> cited cases also indicate that an amendment of the
> judgment here to include Resnick and the Cowans
> would constitute a denial of due process of law. That
> constitutional provision guarantees that any person
> against whom a claim is asserted in a judicial
> proceeding shall have the opportunity to be heard and
> to present his defenses. To summarily add Resnick
> and the Cowans to the judgment heretofore running
> only against Erbel, Inc., without allowing them to
> litigate any questions beyond their relation to the
> allegedly alter ego corporation would patently violate
> this constitutional safeguard. Nor is this difficulty
> overcome by the suggestion that Resnick and the
> Cowans should have intervened in the action brought
> solely against Erbel, Inc., if they desired to assert any
> personal defenses against the drafts. **They were
> under no duty to appear and defend personally in
> that action, since no claim had been made against
> them personally.**

Id. at 176,3. (Emphasis added).

In Katzir's Floor and Home Design, Inc. v. M-MLS.COM, 394 F.3d 1143

(9th Cir. 2004), the Ninth Circuit Court of Appeals reversed the United States

District Court for the Central District of California's decision to modify a

11

default judgment to add the defendant corporation's sole shareholder based upon alter ego liability.  In <u>Katzir's Floor and Home Design, Inc.</u>, the defendant initially answered and defended the lawsuit, however, "faced with financial difficulties...[it] discharged its attorneys in December 2000 and ceased defending the lawsuit." <u>Id.</u> at 1146-7.  As a result,

> **Default was entered** against M-MLS, Inc. on March 9, 2001, for failing to secure new counsel, and a default judgment of $1,638,884 was entered on June 18, 2001, based on an affidavit submitted by Katzir's Floor's owner relating the lost sales Katzir's Floor suffered from its inability to meet orders requiring use of the machine.

<u>Id.</u> at 1147. (Emphasis added).  Next, the default judgment was amended by adding Sommer as an individual "on the bases that Sommer was the alter ego of M-MLS, Inc..." <u>Id.</u> at 1147.  The Court ruled that the district court clearly erred in adding Sommer because "Sommer was not named individually, knew M-MLS, Inc. was on the verge of dissolution through Canadian bankruptcy law, and had no personal duty to defend the underlying lawsuit." <u>Id.</u> at 1150. Moreover, the Court held that, "'To summarily add [corporate shareholders] to [a] judgment heretofore running only against [the corporation], without allowing them to litigate any question beyond their relation to the allegedly alter ego corporation would patently violate [due process].'" <u>Id.</u> at 1150, <u>citing</u> <u>Motores De Mexicali</u>, 51 Cal.2d 172, 176, 331 P.2d 1, 3 (Cal. 1958).

In <u>Bates Marketing Assoc., Inc. v Lloyd's Electronics, Inc.</u>, 190 N.J. Super. 502, 505, 464 A.2d 1142, 1144 (N.J. Super. Ct. App. Div. 1983), the plaintiff obtained a **default judgment** against Western Corp. and filed a

subsequent suit alleging that two new defendants, California, Inc. and Electronics, Inc., were "alter egos of Western and hence that each is liable for Western's actions." The defendants obtained dismissal of the plaintiff's action based upon the entire controversy doctrine and cross appeals ensued. Id. First, the Court ruled that the plaintiff was not barred from bringing a claim against the defendants and that the trial court's dismissal pursuant to the entire controversy doctrine was inappropriate. Id. at 507-8, 1145. Second, the Court considered the defendants' request for "a determination of their right, if the action is viable, to relitigate the issues which were determined in the federal action adversely to Western." Id. at 508, 1145. Relying upon section 59(5) of the Restatement (Second) of Judgments, the Court ruled that "the principle of collateral estoppel clearly does not apply because of the separable nature of the basis of the claim against these defendants." Id. at 508, 1145. Hence, the alleged alter ego defendants had a right to re-litigate the issues which were determined in the federal action adversely to Western. Id.

More recently, in Butterfield Land Co. v. J.S. Furniture, 2005 WL 546599, at *4 (Cal. Ct. App.) the California Court of Appeal ruled that it was improper for a trial court to amend a default judgment obtained against a corporation to include the corporation's alleged alter ego. The Court of Appeal ruled that the shareholder's "interests were not represented by J.S. Furniture, which defaulted, thereby depriving Javier of the opportunity to litigate any issue other than his relationship with J.S. Furniture." Id. The Court concluded

that "it is not enough to say that Javier should have answered since he was never named in the original suit." Id.

The facts of the case at bar squarely fall within Section 59(5) of the Restatement (Second) of Judgments and cited authorities where courts have refused to enforce default judgments against subsequently alleged alter egos. A review of the pleadings in the Pennsylvania Action reveals that neither NORAD nor Miranda were parties to that action. In addition, the action provided no hint whatsoever that Local 430 intended to pursue NORAD or Miranda pursuant to alter ego and/or single employer doctrine liability. In fact, Local 430's claim of $27,513.28 metastasized to almost $2,000,000 and almost four years passed prior to Local 430 advising NORAD and Miranda for the very first time that it intended to hold the latter two liable to satisfy the default judgment entered in the Pennsylvania Action. NORAD and Miranda did not have a full and fair opportunity to litigate this matter. Their constitutional rights to due process will be violated if they are not allowed to litigate any questions beyond their relation to NATCO.

B.      No Court Of Equity Will Enforce The Penalty Which Local 430 Is Pursuing

      1.      The Substance Of The Claims Asserted By Local 430 Against NORAD And Miranda Represents An Unenforceable Penalty.

Determining whether the liquidated damages provision contained in a collective bargaining agreement constitutes a penalty under federal common law requires a two step analysis. "[T]he court must consider whether the harm caused by a breach of the collective bargaining agreement would be difficult or

impossible to estimate, and whether the amount fixed in the liquidated

damages provision of the agreement represents a reasonable forecast of just

compensation for the harm caused." Boards of Trustees of the Ohio Laborers'

Fringe Benefit Programs v. Bihn Excavating, Inc., 2005 WL 14421953, at *3

(S.D. Ohio), citing United Order of Am. Bricklayers and Stonemason Unions No.

21 v. Thorleif Larson & Son, Inc., 519 F.2d 331, 332 (7th Cir. 1995); and,

Bricklayers Pension Trust Fund v. Rosati, Inc., 187 F.3d 634 (Table Decision),

No. 98-1552, 1999 WL 503501, at *2 (6th Cir. July 7, 1999). The so-called

liquidated damages provision in the case at bar fails both steps of the analysis

as a matter of law because: a) The harm caused by a breach of the CBA was

simple to estimate; and b) The amount fixed in the liquidated damages

provision does not represent a reasonable forecast of just compensation for the

harm caused.

    a.    The Harm Caused By A Breach Of The CBA Was Susceptible
            To Precise Mathematical Calculation And In Fact Was
            Precisely Calculated

As early as 1881, the United States Supreme Court ruled "all damages

for delay in the payment of money owing upon contract are provided for in the

allowance of interest, which is in the nature of damages for withholding money

that is due. The law assumes that interest is the measure of all such

damages." Loudon v. Taxing Dist. of Shelby County, 104 U.S. 771, 774, 26

L.Ed. 923, 924 (1881).[10] In United Cable Television of Baltimore L.P. v. Burch,

---

[10] In Darius Sessions v. Richmond, 1 R.I. 298, 1850 WL 1809 (R.I. 1850) the Rhode Island
Supreme Court ruled, "there can be no stipulated damages for the non-payment of money
except the legal interest."

354 Md. 658, 732 A.2d 887 (1999), the Court of Appeals of Maryland explained that the law in fixing the rate of interest has solidified the measure of damages in cases which are simply for the non-payment of money:

> The foregoing is the common law rule.  See Orr v. Churchill, 1 H. Black. 227, 232, 126 E.R. 131, 134-35 (1789) ("[W]here the question is concerning the non-payment of money in circumstances like the present [action of debt on bond], the law having by positive rules fixed the rate of interest, has bounded the measure of damages; otherwise the law might be eluded by the parties.").  See also Fellows v. National Can Co., 257 F. 970, 972 (6th Cir.), cert. denied, 250 U.S. 662, 40 S.Ct. 11, 63 L.Ed. 1195 (1919);  United Shoe Machinery Co. v. Abbott, 158 F. 762, 763 (8th Cir. 1908); Knight v. Marks, 183 Cal. 354, 357, 191 P. 531, 532 (1920); Maybury v. Spinney-Maybury Co., 122 Me. 422, 434, 120 A. 611, 616 (1923); Mead v. Wheeler, 13 N.H. 351, 353-54 (1843); Semico, Inc. v. Pipefitters Local No. 195, 538 S.W.2d 273, 275 (Tex.Civ.App.1976).

Moreover, Professor Corbin specifically states that "[o]ne case in which the courts all agree that the amount is a penalty and unenforceable is where a sum of money is made payable upon default in the payment of a smaller sum of money and the difference between the two sums is not merely the interest value of the smaller."  See 5 A.L. Corbin, Corbin on Contracts § 1065 at 373 (footnote omitted).  In United Cable Television of Baltimore L.P., 354 Md. 658, 675, 732 A.2d at 887, 896 (1999), the Court of Appeals of Maryland ruled that "under the rule which makes interest at the highest lawful rate the measure of damages for breach of a contact to pay money, the anticipated damages are not uncertain and incapable of exact ascertainment."

It is abundantly clear that any breach of the CBA to pay vacation, sick, personal and/or down time owed was simple to estimate according to well settled case law. The calculation could have and should have been the failure to pay wages owed at that time plus interest. One need not look further than Local 430's Request For Default Judgment where Local 430 precisely calculated its actual damages for which it sought "liquidated damages" following NATCO's breach (i.e. vacation time - $15,200.00; unused sick days due - $7,600.00; and personal days due - $4,560.00). See attached "Exhibit G."

> b.  The Amount Fixed In The Liquidated Damages Provision Does Not Represent A Reasonable Forecast Of Just Compensation For The Harm Caused

Williston on Contracts explains when a liquidated damages provision will be unenforceable:

> [A liquidated damages clause] will be held to violate public policy, and hence will not be enforced when it is intended to punish, or has the effect of punishing, a party for breaching the contract, or when there is a large disparity between the amount payable under the provision and the actual damages likely to be caused by a breach, so that it in effect **seeks to coerce performance of the underlying agreement** by penalizing non-performance and making a breach prohibitively and unreasonably costly.

24 Samuel S. Williston, Williston on Contracts § 65:1 at 216-23. (Emphasis added). Here, NORAD was faced with the choice of paying the underlying claim – whether it was liable or not – or run the risk of an additional $1,529.28 accruing each day.

In Forster v. Oro Navigation Co., 128 F.Supp. 113, 117 (D.N.Y. 1954), the plaintiff alleged that he was entitled to $10 a day for each day that payment of his overtime wages was delayed according to a collective bargaining agreement between the defendant and the Seafarers International Union of North America. The United States District Court for the Southern District of New York held that the "agreement fix[ed] alleged damages in advance of a breach, entirely unrelated to any reasonably anticipated damage." Id. at 117. Next, the court refused to enforce the clause rationalizing that "it provides for a penalty and not the liquidation of damages and accordingly is unenforceable." Id.

In Davidow v. Wadsworth Mfg. Co., 211 Mich. 90, 91, 178 N.W. 776 (1920), the Supreme Court of Michigan was confronted with a situation where an employee of a manufacturer was owed wages for 4 days, amounting to $12.32. The plaintiff also sought a statutory penalty of 10 percent per day which had accrued to in excess of $500.00. Id. The Court ruled, "[w]ere we dealing with a contract between private parties where similar language was used, we would not hesitate to hold that the sum here imposed was a penalty and not liquidated damages." Id. at 94, 777.

In this case, ten of the Union's members were claiming a grand total of $27,513.28. The failure to pay this sum within 72 hours of the closing of NATCO's York, Pennsylvania facility resulted in "liquidated damages" in the amount of $1,529,28 per day (i.e. NATCO owed each of the 10 employees eight (8) hours pay for each day of delay). As a matter of law, the liquidated damages provision was not a reasonable forecast of just compensation for the harm

caused to Local 430's members.  To the contrary, it represented an unenforceable penalty.

    2.     Local 430's Counterclaims Are Actions In Equity Not Law

    Virtually the only time that the issue of whether an action based upon alter ego liability or piercing the corporate veil is an action in law or equity, is in the context of whether the moving party is entitled to a jury trial.  The right to a jury trial is governed by the Seventh Amendment of the United States Constitution.  The analysis required to determine the right to a jury trial consists of two prongs:

> "**First**, [courts] compare the statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity. **Second**, [is an examination of] the remedy sought and [a determination of] whether it is legal or equitable in nature."[11]

Tull v. U.S., 481 U.S. 412, 417, 107 S.Ct. 1831, 1835 (1987). (Emphasis added).  As discussed herein, while there is a split among the Circuits on the precise issue addressed, the First Circuit has never decided whether a party seeking to impose liability by virtue of federal or state alter ego doctrines or the federal single employer doctrine is entitled to a jury trial.  However, the United States Supreme Court, as well as numerous other federal and state courts, have ruled that these doctrines are equitable and consequently, that no Seventh Amendment right to a trial by jury exists.

---

[11] Of course, in ruling upon this issue where the substantive law of a state will be at issue in the underlying case "a federal court must look first to state law to determine the elements of the cause of action and the propriety of the remedies sought." Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc., 215 F.3d 182, 186 (1st Cir. 2000). (Citation omitted).

a. Numerous Federal And State Courts Have Held That Alter Ego Liability Is Equitable

The United States Supreme Court as well as numerous other Federal and State Courts have ruled that claims which assert alter ego and single employer liability are equitable.[12]   The United States Supreme Court has held that "[a]lthough a corporation and its shareholders are deemed separate entities for most purposes, the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy." Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co., 417 U.S. 703, 713, 94 S.Ct. 2578, 2584 (1974).  Historically, as the Supreme Court explained, "**courts of equity**, piercing all fictions and disguises, [would] deal with the substance of the action and not blindly adhere to the corporate form." Id. (Emphasis added).

A number of federal courts have expanded upon this general principle, holding that, in cases virtually identical to the instant matter, plaintiffs do not have a constitutional right to a jury trial when pursuing alter ego liability because alter ego liability is equitable.  For example, in Luper v. Banner Industries, Inc. (In re Lee Way Holding), 118 B.R. 544, 548 (Bankr. S.D. Oh. 1990), the court granted a bankruptcy trustee's motion to strike a party's jury

---

[12] It is clear that the two doctrines are so closely aligned that they should receive identical treatment regarding whether the doctrines are legal or equitable.  For instance, the First Circuit Court of Appeals has held that in evaluating whether a company is a "single employer", "most of the alter ego criteria remain relevant."  NLRB v. Hospital San Rafael, Inc., 42 F.3d 45 (1st Cir. 1994).  In addition, the federal alter ego doctrine is closely aligned with Rhode Island common law as evidenced by Brotherhood of Locomotive Engineers v. Springfield Terminal Railway Co., 210 F.3d 18, 26 (1st Cir.2000) which ruled that federal alter ego cases are founded upon the principle that "a corporate entity may be disregarded in the interests of public convenience, fairness and equity." (Citation omitted).

demand in connection with the latter's alter-ego claim.  In so ruling, the court

reasoned that, "[b]ased on the historical nature of the alter-ego doctrine, and

the nature of the remedy sought by the Trustee, the **alter-ego claims** . . . are

**equitable,** and thus, are not afforded a right to a jury trial." (Emphasis added).

More recently, the Seventh Circuit, in Int'l Financial Services Corp. v. Chromas

Tech. Canada, Inc., 356 F.3d 731, 736-38 (7th Cir. 2004), held as follows:

> [F]ederal procedural law controls the question of whether
> there is a right to a jury trial. ...Thus, contrary to the
> Second Circuit's tacit assumption, a district court could
> both safeguard a plaintiff's Seventh Amendment right to
> a jury trial on legal claims for money damages and
> separately decide, in the exercise of its **equitable powers**,
> whether to pierce the corporate veil.

(Emphasis added).[13]  Numerous other federal courts are in accord.[14]

---

[13] Specifically, the Int'l Financial Svcs., Corp., court was referring to Wm. Passalacqua Builders, Inc., v. Resnick, 933 F.2d 131 (2nd Cir. 1991).  In addressing the split between the Seventh and Second Circuits concerning whether a jury trial attaches to attempts to pierce the corporate veil, the Int'l Financial Svcs., court remarked, "we take issue with the [Second Circuit's] conclusion that, because a plaintiff pursues a legal remedy (a money judgment), he is entitled to a jury trial not only on the merits but also on whether the corporate entity should [be] disregarded.  A jury trial does not have to include all or nothing." Int'l Financial Svcs., 356 F.3d at 757.

[14] See U.S. v. Golden Acres, Inc., 684 F.Supp. 96, 103 (D.DE. 1988) ("Piercing the corporate veil is an **action that sounds in equity** . . . . Accordingly, we grant the government's motion to strike the defendants' jury demand.") (Emphasis added); Johnson v. Continental Airlines, Inc., 720 F.Supp. 1467, 1484 (D. Colo. 1989) ("[T]he ultimate decision of whether to disregard the corporate form, and the underlying public policy on which it is based, lies in **equity** . . . . To this end, the issue of whether adherence to the corporate form promotes injustice may be a matter for the court.") (Emphasis added); Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc., 758 F.Supp. 1054, 1057 (W.D. Pa. 1990) ("In deciding whether to pierce the corporate veil, courts are basically concerned with determining if **equity** requires that the shareholders' traditional insulation from personal liability be disregarded . . . . Thus, the court must inquire whether corporate formalities have been observed . . . .") (Emphasis added); and, Richmond, Fredericksburg & Potomac Railroad Co. v. Clarke, No. 90-00336, 1991 WL 321033, at *4 (E.D. Va. Jan 22, 1991) ("Clarke asserts that he should be granted a jury to contest RF & P's federal common law theory of damages arising from a claim that Clarke  was an **alter ego** for  L . A . Clarke . . . this claim too is essentially **equitable in nature** . . . . Because this, as well as RF & P's other claims against Clarke, are equitable in nature, this Court should and will grant RF & P's Motion to Strike Clarke's jury demand.") (Emphasis added).

Several state courts have reached identical conclusions. Most significantly, the Supreme Court of Delaware, a State which has not merged the courts of law and chancery, has held that "piercing the corporate veil may be done **only in the Court of Chancery**, when the purpose of the action is to obtain a judgment against individual stockholders or officers, or against other corporations..." Sonne v. Sacks, 314 A.2d 194, 197 (De. 1973).[15] In Atlas Construction Co. v. Slater, 746 P.2d 352, 359 (Wyo. 1987) the Supreme Court of Wyoming, held "[w]e conclude that **there exists no right to a jury trial on the issue of piercing the corporate veil**." (Emphasis added). Similarly, in Dow Jones Co., Inc. v. Avenel, 151 Cal.App.3d 144, 147, 198 Cal.Rptr. 457, 460 (1984), the California Court of Appeals for the First District, First Division held that "[the] **alter ego doctrine is essentially an equitable one** and . . . is **particularly within the province of the trial court**." (Emphasis added). Not surprisingly, other states concur.[16]

---

[15] Sonne, supra, did not deal with the issue of whether an action seeking to pierce the corporate veil is a jury matter by right but rather, which court (law or chancery) should consider such an action.

[16] See W & H Machine & Tool Co. v. National Distillers and Chemical Corp., 283 So.2d 173 (Ala. 1973) (holding that "[i]n nearly all Alabama cases . . . which have employed the 'instrumentality rule' or 'pierce the corporate veil' theory, it is indicated that the court does so sitting as a **court in equity**." (Emphasis added); McCain Foods, Inc. v. St. Pierre, 463 A.2d 785, 787 (Me. 1983) ("The issue of **whether the corporate form should be disregarded . . . is an issue involving the courts' equitable powers**.") (Emphasis added); Oklahoma Oil & Gas Exploration Drilling Program v. W.M.A. Corp., 877 P.2d 605, 612 (Okla. App. Ct. 1994) ("Appellants sought judgment against W. Mike Adams personally . . . equitable issues are paramount in this action and Appellants have not been denied a right to a jury trial."); and, Thorn v. Thorn's Diesel Service, Inc., 788 So.2d 140, 145 (Ala. 2000) ("the **piercing-the-corporate-veil doctrine is an equitable doctrine** . . . . Therefore to the extent that [plaintiff's] claims raise equitable issues, the trial court must dispose of those issues without a jury.") (Emphasis added).

b.  The Remedy Sought By Local 430 Is Equitable

The remedy expressly sought by Local 430 provides additional support for Plaintiffs' assertion that Local 430's counterclaims are equitable.  In this case, none of the counts asserted by defendants seek compensatory damages, a regularly utilized litmus test in legal actions.  Instead, defendants request that this court:

> **Count I** - "declare that NATCO, NORAD, and Miranda constitute a single employer and that, therefore, Miranda and NORAD are both liable for the judgment entered against NATCO . . .";
> **Count II** – "declare that NATCO, NORAD, and Miranda are alter egos or one another and that therefore Miranda and NORAD are both liable for the judgment entered against NATCO . . ."; and
> **Count III** – "declare that Miranda is an alter ego of NATCO and that therefore Miranda is liable for the judgment entered against NATCO . . ."

The case at bar is indistinguishable from <u>Ed Peters Jewelry Co., Inc.</u>, 215 F.3d 182 (1st Cir. 2000), where the First Circuit Court of Appeals upheld this Court's denial of a jury trial request in a successor liability action. Significantly, the Court ruled, "We point out that this case does not involve the computation of damages, which is often considered a determination to be made by a jury." <u>Id</u>. at 186.  The Court went on to state that "this is an action to recover on debts, the amounts of which have been reduced to judgments ..." <u>Id.</u> at 186.  That is exactly the situation before this Court.

c.  Any Reliance Upon Cases Ruling That Piercing The Corporate Veil Is An Action At Law (Explicitly or Implicitly) Is Misplaced

A decision by the Second Circuit Court of Appeals provides the most significant support for the view that an action to pierce the corporate veil is legal, not equitable in nature.  In the words of the Second Circuit:

> The latter view [disregarding the corporate form is of
> legal origin] appears to have the greatest historical
> support. According to Professor Phillip Blumberg,
> enforcement of shareholder liability for corporate
> obligations began as "a crude system in which any
> creditor with an unsatisfied judgment against the
> corporation sued any shareholder at common law."
> Blumberg, <u>The Law of Corporate Groups: Tort,
> Contract, and Other Common Law Problems in the
> Substantive Law of Parent and Subsidiary
> Corporations</u> § 2:02 at 52 (1987) (Blumberg, <u>The Law
> of Corporate Groups</u>); cf. <u>Widdrington v. Cudworth and
> Others</u>, (1661) Vidian's Exact Pleader, p. 3 (plaintiff
> who brought action in tort at common law claiming
> conspiracy to eject a fellow from Cambridge college,
> sued the fellows as a combination of individuals rather
> than the college as a corporation) (cited in Baker, <u>An
> Introduction to English Legal History</u> 524 (3d ed.
> 1990)).

<u>Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.</u>, 933 F.2d

131, 135-6 (2nd Cir. 1991). Nevertheless, the reasoning of <u>Wm. Passalacqua</u>

<u>Builders, Inc.</u> is fatally flawed for at least two reasons.[17] As modern lawyers

frequently forget, if they ever knew, limited liability of shareholders of

corporations was not the automatic result that exists today. First, in England,

shareholders were historically liable for a corporation's debts without any

mechanism such as piercing the corporate veil as acknowledged by the very

comment of Professor Blumberg quoted by the Passalacqua court – "[a]ny

creditor with an unsatisfied judgment against a corporation sued any

shareholder at common law." Professor Blumberg goes on to say:

> Though, Holdsworth, Williston, and Gower conclude
> that direct liability, in the absence of charter provision,
> for shareholders of commercial corporations had come

---

[17] The Seventh Circuit Court of Appeals agrees that in regard to this issue the Second Circuit
Court of Appeals is wrong. <u>See</u> F.N. 13.

> to an end by the seventeenth century, other scholars
> place the date much later.  DuBois, for example,
> concludes that limited liability was of slight
> importance at this early date, and that the relation
> between incorporation and limited liability was still
> equivocal. The Handlins concur, asserting that limited
> liability was still a fuzzy question[18] by the end of the
> eighteenth century. The evidence from the legal
> commentary of the time also provides support for the
> later date. **Hobbes, writing in 1654, referred to the
> unlimited liability of members of "a body politic or
> merchants." Similarly, neither Sir Edward Coke,
> writing in 1612, nor Blackstone, writing in 1765,
> nor Kyd, writing in 1792, listed limited liability
> among the essential attributes of the corporation.**

Blumberg, <u>supra</u>, § 1.03.1 at 10-11. (Citations omitted)(Emphasis added).

Second, a review of the treatise cited by the Second Circuit (Baker, <u>An Introduction to English Legal History</u>) reveals that the case of <u>Widdrington v. Cudworth and Others</u>, dealt with economic torts of intimidation and conspiracy and had absolutely nothing to do with piercing the corporate veil:

> In 1662, for instance, an action was brought for
> conspiring to eject a fellow of a Cambridge college, and
> for making a false and scandalous return to the
> *mandamus* to restore him; the significance of the
> "conspiracy" here was that the action was brought
> against the fellows as a combination of individuals
> rather than against the college as a corporation.

J.H. Baker <u>An Introduction to Legal History</u> at 524 (3d ed. 1990).  As late as the first quarter of the nineteenth century, direct shareholder liability was regularly imposed in the United States:

---

[18] The description that this is a "fuzzy question" is not surprising considering that "during the entire eighteenth century, for example, the English government had chartered only a half dozen corporations for manufacturing and 'hardly more' for other businesses." Blumberg, <u>The Law of Corporate Groups: Tort, Contract, and Other Common Law Problems in the Substantive Law of Parent and Subsidiary Corporations</u> § 1.03 at 13 (1987) (Blumberg, <u>The Law of Corporate Groups</u>) (Citation omitted).

> By the start of the nineteenth century, direct shareholder
> liability was still common.  In Massachusetts, about half
> of the early charters imposed full direct liability on shareholders
> for the corporate debts; the others were silent.  None
> provided for limited liability.

Blumberg, <u>supra</u>, § 1.04.1 p. 26. (Citations omitted).  Statutory limited liability

did not arise until the first and second quarters of the nineteenth century:

> New Hampshire in 1816 and Connecticut in 1818
> adopted limited liability for manufacturing companies.
> Maine followed suit in 1823.  The stage moved to
> Massachusetts where businessmen and political
> figures argued that these other New England states
> were attracting capital investment as a result of their
> more liberal statutes.  The depression of 1829 gave
> further impetus to the business campaign.  In 1830,
> Massachusetts finally adopted a statute providing for
> limited liability.  Although special incorporation was
> still required, it was freely granted.
>
> New York in 1811 and New Jersey in 1816 adopted
> statutes for the incorporation of manufacturing
> companies providing for double liability; these were
> ultimately replaced by limited liability.  Rhode Island,
> second only to Massachusetts in the extent of
> industrialization, was the last to yield.  Limited liability
> for Rhode Island manufacturing companies did not
> come until 1847.

Blumberg, <u>supra</u>, §1.04.4 at 33-4. (Citations omitted).  Finally, England

followed as, "[l]imited liability became the rule in Canada in 1850, long after its

acceptance generally in the United States, **but still a few years ahead of its**

**acceptance in England**." (Emphasis added).  Blumberg, <u>supra</u>, §1.04.4 at 33-

4.  In short, piercing the corporate veil was never an action at law prior to

American Independence.  There was no "veil" to pierce.

     A related issue arose with <u>Plaintiffs' Motion to Strike Defendants' Jury</u>

<u>Demand</u> and <u>Defendants' Objection to Motion to Strike Jury Demand</u>, in which

Local 430 cited several cases where the issue of piercing the corporate veil and/or alter ego was submitted to a jury. The fact that some cases were decided by a jury means nothing because parties are free to consent to a jury trial pursuant to Fed. R. Civ. P. 39(c) and/or R.I. Super. R. Civ. P. 39(c). Therefore, nothing is to be learned from cases where the issue of piercing the corporate veil and/or alter ego liability was submitted to the jury without challenge. For instance, <u>Crane v. Green & Freedman Baking Co., Inc.</u>, 134 F.3d 17, 22 (1st Cir. 1998), involved a **consensual** jury trial. There, the First Circuit observed that "the jury trial here, **not being of right**, was undertaken by the judge with consent of both parties," and by pointing out that the jury trial was "not being of right," actually provides support for Plaintiffs' position. <u>Id.</u> (Emphasis added).

3.  An Unconscionable Result Will Not Be Permitted In A Court Of Equity

<u>American Jurisprudence</u> has described the necessity of a court sitting in equity, doing justice:

> A court of equity seeks to do justice, and not injustice. Nothing unconscionable will be permitted within the jurisdiction of a court of equity. A court of equity is never required to render, or justified in rendering, an inequitable decision or decree, nor will a court of equity do inequity in the name of equity. The court will grant relief only when fairness and good conscience demand it.

27A Am. Jur.2d Equity §110 (1996). Enforcing the penalty contained in the CBA (between NATCO and Local 430) against NORAD and Miranda is unconscionable. The so-called "liquidated damages" which have multiplied the

underlying debt from $27,513.28 to approximately $2,000,000 must shock the conscience of this Court and warrant its refusal to enforce the Pennsylvania Action judgment against NORAD and/or Miranda.

Finally, Plaintiffs have not taken any position regarding whether the penalty should be enforced against NATCO as that corporation is not a party to the within action.

## IV.    CONCLUSION

For the reasons contained herein Plaintiffs respectfully request that Local 430's counterclaims asking that Plaintiffs be deemed liable on the judgment be dismissed as a matter of law. To the extent that Local 430 claims that there is any liability on the underlying contract (as opposed to the judgment), Plaintiffs have no objection to an amendment of Local 430's Counterclaims or any other procedural mechanism to litigate such claims.

North Atlantic Distribution, Inc. and
Michael Miranda
By their Attorneys


Max Wistow, Esq. (#0330)


Jeffrey A. Mega, Esq. (#6441)
Wistow & Barylick Incorporated
61 Weybosset St.
Providence, RI 02903
(401) 831-2700 (Telephone)
(401) 272-9752 (Facsimile)

_Thomas J. Mc Andrew_

Thomas J. McAndrew, Esq. (#1001)
One Turks Head Place, Ste. 205
Providence, RI 02903
(401) 455-0350 (Telephone)
(401) 455-0882 (Facsimile)

## CERTIFICATION

I hereby certify that I hand-delivered a true copy of the within, on the _10th_ day of February, 2006, to the following:

Christopher H. Little, Esq.
Little Medeiros Kinder Bulman & Whitney, PC
72 Pine Street
Providence, RI 02903

_Maria Souza_

F:\Miranda, Mike (NORAD) #6523\PLEADINGS\US DISTRICT CT\Memo of Law in Support of Plaintiffs Motion for Summary Judgment.doc

29