# EXHIBIT E
# Pgs. 1-19

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTH ATLANTIC DISTRIBUTION, INC.; and MICHAEL MIRANDA, | ) | |
| Plaintiffs, | ) | C.A. No. 05-348 L |
| v. | ) | |
| TEAMSTERS LOCAL UNION NO. 430; TEAMSTERS LOCAL UNION NO. 776; DANIEL A. VIRTUE, in his Capacity as President of Teamsters Local Union No. 776; and JOHN L. FOGLE, in his Capacity as Secretary of Teamsters Local Union No. 776, | ) | |
| Defendants. | ) | |

**DEFENDANTS' SUPPLEMENTAL RESPONSES TO INTERROGATORIES**

Defendants Teamsters Local Union No. 430, Teamsters Local Union No. 776, Daniel A. Virtue, and John L. Fogle ("Defendants") hereby supplement their responses to the First Set of Interrogatories propounded by Plaintiffs North Atlantic Distribution, Inc. ("NORAD") and Michael Miranda ("Miranda"). Defendants incorporate herein the general and specific objections set forth in their prior responses.

**Interrogatories**

**Interrogatory No. 1**

State all facts upon which you base your contention that, "NATCO, NORAD and Miranda constitute a single employer for the purposes of the CBA here at issue," as set forth in paragraph No. 13 of Defendants' Counterclaims.

**Response to Interrogatory No. 1**

In addition to the forgoing general objections, Defendants object that many of the facts that support the contention that the Miranda Entities constitute a single employer for purposes of the CBA are within the knowledge and control of the Miranda Entities, and Defendants' efforts

to uncover these facts through discovery is ongoing. Subject to and without waiving these objections, Defendants state that: a) the operations of the Miranda entities were thoroughly integrated and interrelated such that the various companies all operated on a day-to-day basis as a single business; b) the Miranda Entities shared common management and supervisory personnel; c) the common management and supervisory personnel exercised centralized control over critical business decisions for both NORAD and NATCO, including policy-level matters concerning labor relations; and d) both NORAD and NATCO were wholly owned by Michael Miranda.

For example, NATCO had employees, such as drivers and yard workers, that were located in York, Pennsylvania, but NATCO and other Miranda affiliated companies used NORAD's management team located at 100 Tidal Drive, North Kingstown, Rhode Island to run the day-to-day management aspects of all companies. The North Kingstown address was the business address for all of the Miranda Entities. NORAD paid office expenses, executive salaries, and employee benefits that were partially allocated to NATCO each month. *See* MAJ 3139–508; MAJ 3665–86; T 1–9091; T 9724–15324; T 16020–508; Confidential 1–3607. Michael Miranda was the sole shareholder of both NORAD and NATCO. Miranda and Aldo Caputo were corporate officers of both NORAD and NATCO. Together, Miranda and Caputo made the relevant executive-level decisions and exerted control over the management and labor relations of both companies. *See* MAJ 3139–3-633; T 19–9091; T9724–15038; T 16020–508; Confidential 1–3607.

Answering further, Defendants refer to and incorporate herein their Responses to Interrogatories 2 and 3.

Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of the information obtained in discovery proceeds.

**Supplemental Response to Interrogatory No. 1.**

Answering further, the bases for Defendants' contention that Plaintiffs constitute a single employer are that: a) the operations of the Miranda entities were integrated and interrelated such that the various companies all operated on a day-to-day basis as a single business; b) the Miranda Entities shared common management and supervisory personnel; c) the common management and supervisory personnel exercised centralized control over critical business decisions for both NORAD and NATCO, including policy-level matters concerning labor relations; and d) NORAD and NATCO, as well as MAP and VSG, were wholly owned by Michael Miranda.

The operations of the Miranda entities were integrated in that NATCO performed essential trucking services that were part of the overall services that the Miranda entities

performed. Miranda, through his companies, was in the primary business of prepping, marshalling, and delivering cars to car dealerships. In addition, Miranda's companies performed other related services, such as accessorizing and repairs, that customers of the Miranda companies wanted the Miranda companies to provide. Generally, NORAD unloaded, processed, and accessorized cars at the facility in Davisville, and MAP unloaded and marshaled cars in York. NATCO provided the trucking services necessary to transport the unloaded cars from NORAD's Davisville location and MAP's York location to dealers throughout the region. When necessary, NATCO would also transport cars from dealerships or auctions to the Davisville or York locations or between Davisville and York. VSG, another Miranda-owned company, also transported cars as part of the overall services that the Miranda entities provided.

Integration of the Miranda companies is demonstrated by the fact that the companies shared each other as customers and shared various car manufacturers and dealers as common customers as well. A substantial portion of NATCO's revenues during the relevant time frame came directly from hauling cars for NORAD and MAP. For example, NATCO's trucking revenues from NORAD totaled $623,982 for 1999, $823,002 for 2000, and $581,882 for 2001. NATCO's trucking revenues from MAP during those years totaled $411,707, $369,579, and $289,736, respectively. In addition, NATCO provided trucking services for customers, such as Volkswagen, Subaru, Isuzu, and Chrysler, for whom NORAD and MAP provided unloading, processing, and marshaling services. For instance, NATCO's revenues from VW in 2001 totaled more than $522,000. *See*, *e.g.*, MAJ 3637, 3645, 3653, 3660–61. Substantially all of VSG's operating revenues for the relevant years are from trucking services VSG provided to the other Miranda companies.

In order to coordinate the services provided by the integrated Miranda companies, all of the inventory control functions of the companies were performed out of a single office at 100 Tidal Drive at the Davisville location. NATCO had no computer servers of its own to run database software to track inventory. Instead, NATCO used Access and Foxpro software running on NORAD's computer server to track inventory and deliveries. This was the same software, running on the same server, that NORAD and other Miranda entities used for the same inventory control purposes. From the York location, NATCO used a dial in service, PC Anywhere, to transfer database information to the computer in Davisville.

Support, administrative, and management functions were also centralized and integrated at the 100 Tidal Drive location, where employees performed the same functions for all of the Miranda entities. For example, the shared computer system at the 100 Tidal Drive offices was also used for accounting for all of the Miranda entities. Aldo Caputo, a NORAD employee, oversaw the accounting function for NORAD, NATCO, VSG, and MAP at that location. During 2001, NORAD and NATCO used the same outside payroll service to handle the payroll for both companies. Although NORAD and NATCO had separate phone lines, there was a single phone system and a single voicemail system at the 100 Tidal Drive offices that was shared by both companies. The office at 100 Tidal Drive was owned by NORAD on leased land, but NATCO paid no rent for its use of the space.

The degree of integration is also shown by the Miranda companies' financing transactions. During the relevant time frame, the Miranda entities applied for and obtained various term loans, lines of credit, and credit extensions which provided that NORAD, NATCO, MAP, and VSG were joint borrowers. Michael Miranda would sign on behalf of each of the companies, and would also personally guarantee the loans. *See*, *e.g.*, Conf. 281–833, 913–1607,

1608; T 14231, 14410. For example, NATCO and NORAD were co-borrowers in 2002 for a $2 Million secured term loan and a $1 Million secured line of credit even after NATCO had ceased its operations in York.

Likewise, the degree of integration is also shown by the Miranda companies' leasing transactions. Equipment leases entered by the Miranda entities during the relevant time period show that NORAD and NATCO (along with MAP and VSG) were joint lessees of the trucks and other equipment used in connection with the overall services provided by the Miranda companies. *See, e.g.*, Conf. 125, 131–52, 190–92, 205–25, 226–32, 253–62, 263–69, 270–78, 5261–62; T 14309–28, 14439–46, 14515–38, 14539–45, 14546–54, 17127–29. Miranda negotiated these leases on behalf of all of the joint lessees and signed as president of each of the Miranda companies. NORAD also guaranteed leases of NATCO and VSG. *See, e.g.*, T 10982, 14514. The Miranda companies also shared their lease expenses. *See, e.g.*, T 11843, 17346. Miranda testified that the reason the companies were joint lessees was because they would all mutually benefit from the leases, and share the use of the leased equipment.

In addition to such transactions with others, the Miranda companies also engaged in inter-company transactions that indicate a degree of integration that is not consistent with truly separate and independent businesses. The Miranda companies made numerous loans to and from one another during the relevant time frame. *See, e.g.*, T 1605–06, 10385–86, 17108–18, 17293–63, 17609, 18152–53, 18527–29. There was no formal policy for documenting the loans, but they were authorized by Michael Miranda. *See, e.g.*, T 16395. NORAD carried receivables from the other Miranda entities of more that a million dollars in both 1999 and 2000 and more than $600,000 in both 2001 and 2002. *See, e.g.*, T 10377, 11595, 16294. Despite these substantial receivables, there was apparently no formal note or repayment terms between the

companies. In addition to intercompany loans, the various Miranda companies also made personal loans to Miranda's sons. *See, e.g.*, Conf. 3692–94, T 11164.

During the relevant time frame, the Miranda companies used a large number of general ledger accounts to track intercompany transactions and allocate shared expenses and costs. *See, e.g.*, T 10385–90, 10082–87, 12357–64. NATCO's general ledger shows that many of the company's expenses were originally paid by NORAD and then allocated to NATCO by journal entry. For example, NORAD paid for insurance for NATCO, and both companies shared a single group health insurance plan for their employees. *See, e.g.*, Conf. 5817–25, T 10201–02, 11145, 13390. Other expenses that were shared in this manner included trucking supplies, truck and trailer upkeep, diesel fuel, transportation claims, dental insurance, employee life and disability insurance, shop supplies, classified ads, legal fees, consulting and professional services, telephone, freight, office expense, outside services, and interest. *See, e.g.*, MAJ 3665–86; T 1800, 1802, 1806, 1814, 1824–25, 1849, 1854, 1859, 1863, 1867, 1871, 1900, 1903, 1932–33, 1940, 1969.

Moreover, the nature of the intercompany transactions, particularly the management fees, further indicates that NORAD and NATCO were not operated as separate independent companies. According to its financial statements and tax returns, NATCO was paid management fees totaling some $170,000 during the years 1999–2001. *See, e.g.*, T 4, 10, 16. The management fees appear to have been determined and paid at each year end, but Plaintiffs have not produced any supporting materials that indicate precisely what management services NATCO provided to the other Miranda entities, if any. Thus, the management fees appear to reflect only a means of transferring money from one Miranda-owned company to another to serve Miranda's own interests.

Management of the Miranda companies was centralized in the person of Michael Miranda. Beginning in 1999, Michael Miranda was the president, treasurer, and sole director of NORAD, NATCO, MAP, and VSG. Certain low-level, non-union employees could be hired and fired by the various managers of the Miranda companies, but only subject to the conditions and policies established by Miranda himself. Michael Miranda was the person who made hiring and firing decisions with respect to the managers. The Miranda companies did not have separate written employee policies. Rather, all policies were set by Michael Miranda. With the assistance of the same counsel, Miranda was also the person who negotiated all collective bargaining agreements for all of the companies. Miranda was responsible for all decisions regarding how any of the companies responded to or handled grievances and other labor matters. Other functions such as accounting, bookkeeping, and financial management of the companies were centralized in Aldo Caputo, who was the secretary of NORAD, NATCO, VSG, and MAP during the relevant times. Although Caputo performed such functions for all of the Miranda companies, he was primarily compensated for these services by NORAD. He received no separate compensation from MAP or VSG even though he performed accounting and financial management services for those companies.

Ownership of the Miranda companies was also common during the relevant time period because as of January 1, 1999, Michael Miranda was the sole owner of NORAD, NATCO, VSG, and MAP. All of the Miranda companies are S-corporations; all gains and losses of the Miranda companies pass-through to Michael Miranda himself.

**Interrogatory No. 2**

Paragraph No. 14 of Defendants' Counterclaims contains the following allegation:

> The operations of NATCO, NORAD and Miranda were completely integrated. Business expenses, physical plant, customer relationships, equipment leases, and liability for corporate financing were all shared among the various entities.

State all facts upon which the allegations contained in paragraph No. 14 are based, including but not limited to:

a. the date, nature and amount of each shared business expense and the identity of the parties that shared each expense;

b. the date(s) and identities of parties that shared physical plant(s) as well as the address(es) of the shared plant(s);

c. the identity of shared customers, the identity of individuals/companies that shared customers and the time period(s) that the customers were shared;

d. the identity of the parties that were sharing customers, the time period that said customers were shared and whether or not the parties had written contracts with the shared customers;

e. the parties, date(s) and nature of each shared equipment lease; and,

f. the parties, date(s) and nature of each agreement which called for shared liability of corporate financing.

**Response to Interrogatory No. 2**

In addition to the forgoing general objections, Defendants object that many of the facts that support the contention that the operations of the Miranda Entities were completely integrated and are within the knowledge and control of the Miranda Entities, and Defendants' efforts to uncover these facts through discovery is ongoing. Subject to and without waiving these objections, Defendants state that insurance premiums were combined for both NORAD and NATCO (and other Miranda-affiliated companies) and allocated between them. For example the Doorley Agency billed NORAD for multiple insurance policies, including workers compensation in Pennsylvania, even though NORAD's workforce was entirely in Rhode Island—only NATCO and other Miranda affiliated companies (other than NORAD itself) had employees in Pennsylvania. Though billed to and paid by only one company, such insurance expenses were internally allocated between the various Miranda Entities. *See, e.g.*, T 10205–06, 10465–67, 10499–526, and 11176–77.

Likewise, expenses for trucking supplies, truck and trailer upkeep and maintenance, diesel fuel, transportation claims, health insurance, dental insurance, employee life-disability

insurance, shop utilities, classified ads, legal fees, consulting and professional services, telephone, freight, office expenses, outside services, and interest were paid by NORAD and then allocated to NATCO for internal accounting purposes. *See* MAJ 3074–113; T 413–5224; T 9724–15038; Confidential 1769–3607. Other expenses, such as office supplies, were invoiced to a single company but paid via separate checks by several companies. For example, Office Max's invoices would be sent to NATCO but would include charges for NORAD or other Miranda-affiliated companies as well. The invoices would then be paid with multiple checks from the respective companies. *See*, *e.g.*, Confidential 2732 and 2756.

Answering further, the extent of shared business expenses and the nature, date, and amount of each such shared expense can be determined from Plaintiffs' own business and accounting records, and pursuant to Rule 33(d), Defendants direct Plaintiffs to those records.

The shared physical plant includes the shared office located at 100 Tidal Drive, North Kingstown, Rhode Island. The shared customers of the Miranda Entities included Subaru, Volkswagen, and Isuzu. Chrysler was a shared customer of NORAD and Mid Atlantic Processing, Inc. ("MAP"), a Miranda-affiliated company. In addition, there were inter-company sales between NATCO, NORAD, and other Miranda-affiliated companies. *See* MAJ 3074–508, MAJ 3634–86; T 1–18; T 413–5224; T 9724–15038; T 16020–508; Confidential 1769–3387. Defendants are continuing their discovery of Plaintiffs with respect to Plaintiffs' shared customers and the various contracts and related correspondence between Plaintiffs and their shared customers.

Substantially all of the equipment used by NATCO in its business was leased, and nearly all of these leases were co-signed by NORAD and/or Miranda. Likewise, financing for NATCO, such as that obtained from Citizens Bank, was signed by NORAD, NATCO, Miranda personally, as well as by other Miranda-affiliated companies. *See* T 9724–15038; T 16020–508; Confidential 122–1768.

Answering further, more specific answers and examples can be adduced from Plaintiffs' own business records, and pursuant to Rule 33(d), Defendants direct Plaintiffs to those records. Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of the information obtained in discovery continues.

**Supplemental Response to Interrogatory No. 2.**

Answering further, Defendants refer Plaintiffs to Defendants' supplemental response to Interrogatory 1, above.

**Interrogatory No. 3**

Paragraph No. 16 of Defendants' Counterclaims contains the following allegation:

> Miranda exercised centralized control over all operations of NATCO and NORAD, including but not limited to control of labor relations.

State all facts upon which the allegations contained in paragraph No. 16 are based, including but not limited to the identity of all operations that Miranda exercised centralized control over and the time period that such control was exercised.

**Response to Interrogatory No. 3**

In addition to the forgoing general objections, Defendants object that many of the facts that support the contention that Miranda exercised centralized control over NATCO's and NORAD's operations are within the knowledge and control of the Miranda Entities, and Defendants' efforts to uncover these facts through discovery is ongoing. Subject to and without waiving these objections, Defendants state that Michael Miranda was the sole shareholder and the president of both NATCO and NORAD. As such, he was the final decision maker with respect to all operational, financial, managerial, and labor matters at both companies. *See* MAJ 3114–633; T 19–181; T9724–15038; T 16020–508; Confidential 1–1768.

Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of the information obtained in discovery proceeds.

**Supplemental Response to Interrogatory No. 3.**

Answering further, Michael Miranda served as the chief executive officer of NATCO, NORAD, VSG, and MAP at all relevant times. Beginning in 1999, Michael Miranda was the president, treasurer, and director of NORAD, NATCO, MAP, and VSG. As president and sole shareholder of each of these companies, Michael Miranda had final decision making authority with respect to all operational, financial, managerial, and labor matters at all of the Miranda companies. Michael Miranda's signature on all of the pertinent lease agreements, customer contracts, and loan documents indicates that Miranda also exercised his authority with respect to all vital company matters. Certain low-level, non-union employees could be hired and fired by the various managers of the Miranda companies, but only subject to the conditions and policies established by Miranda himself, and subject to his knowledge (which could be after the fact). Michael Miranda was the person who made hiring and firing decisions with respect to the managers. The Miranda companies did not have separate written employee policies. Rather, all decisions regarding policy matters were made by Michael Miranda. Other than low-level

decisions that could be made by individual managers, all of the decisions affecting the companies were made by Miranda.

All policy-level questions relating to labor matters involving any of the Miranda entities were decided by Miranda himself. For example, with the assistance of the same counsel, Miranda was the person who negotiated all collective bargaining agreements for all of the companies. Miranda was responsible for all decisions regarding how any of the companies responded to or handled grievances and other labor matters. Miranda testified, for example, that he decided, on the advice of counsel, for NATCO to neither defend or appear with respect to the arbitration of Teamster 430's claims and the subsequent district court action in Pennsylvania to enforce the arbitration award. With respect to other labor claims against NATCO and VSG, Miranda decided, on the advice of counsel, to settle. Miranda paid for the settlement of such claims against NATCO and VSG with a personal check, and he was subsequently reimbursed for the settlement by NORAD.

Other functions such as accounting, bookkeeping, and financial management of the companies were centralized in Aldo Caputo, who was the secretary of NORAD, NATCO, VSG, and MAP during the relevant times. Although Caputo performed such functions for all of the Miranda companies, he was primarily compensated for these services as an employee of NORAD. He received no separate compensation from MAP or VSG even though he performed accounting and financial management services for those companies.

**Interrogatory No. 4**

State all facts upon which you base your contention that "under the federal labor law, Miranda, NATCO, and NORAD are all alter egos of one another for purposes of the CBA and arbitration award here at issue," as set forth in Paragraph No. 17 of Defendants' Counterclaims.

**Response to Interrogatory No. 4**

In addition to the forgoing general objections, Defendants object that many of the facts that support the contention that the Miranda Entities are alter egos of one another under federal labor law are within the knowledge and control of the Miranda Entities, and Defendants' efforts to uncover these facts through discovery is ongoing. Subject to and without waiving these objections, Defendants state that the Miranda Entities have common management and ownership. The Miranda Entities were operated with a common business purpose as if they constituted a single continuing enterprise. They used common premises and equipment to serve common customers within the same geographic market. Moreover, the nature of the dealings and transactions between the various Miranda Entities (and other Miranda-affiliated companies) were less than arms-length. The same owner and management were on both sides of the inter-company transactions, such as the exchange of so-called "management fees" between the companies. Moreover, the timing of NATCO's cessation of operations indicates that a purpose of the transaction was to evade NATCO's labor law responsibilities. *See* MAJ 3074–686; T 1–181; T 413–5224; T 9724–15038; T 15039–298; T 16020–1649; Confidential 1–3607.

Answering further, Defendants refer to and incorporate herein their Responses to Interrogatories 5–11.

Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of the information obtained in discovery proceeds.

**Supplemental Response to Interrogatory No. 4.**

Answering further, the basis for Defendants' contention that Plaintiffs constitute alter egos for labor law purposes is that the Miranda companies share common management, a common business purpose, common premises and equipment, common customers, and have integrated operations that indicate that dealings between the companies are less than arms-length. Also, Michael Miranda, who exercised common management and decision making authority for all of the companies, decided not to pay NATCO's collective bargaining obligations despite the fact that it was profitable at the time.

Miranda entities were operated with a common business purpose as if they constituted a single continuing enterprise. NATCO performed essential trucking services that were part of the overall services that the Miranda entities performed. Miranda, through his companies, was in the primary business of prepping, marshalling, and delivering cars to car dealerships. In addition,

Miranda's companies performed other related services, such as accessorizing and repairs, that customers of the Miranda companies wanted the Miranda companies to provide. Generally, NORAD unloaded, processed, and accessorized cars at the facility in Davisville, and MAP unloaded and marshaled cars in York. NATCO provided the trucking services necessary to transport the unloaded cars from NORAD's Davisville location and MAP's York location to dealers throughout the region. When necessary, NATCO would also transport cars from dealerships or auctions to the Davisville or York locations or between Davisville and York. VSG, another Miranda-owned company, also transported cars as part of the overall services that the Miranda entities provided.

Integration of the Miranda companies is demonstrated by the fact that the companies shared each other as customers and shared various car manufacturers and dealers as common customers as well. A substantial portion of NATCO's revenues during the relevant time frame came directly from hauling cars for NORAD and MAP. For example, NATCO's trucking revenues from NORAD totaled $623,982 for 1999, $823,002 for 2000, and $581,882 for 2001. NATCO's trucking revenues from MAP during those years totaled $411,707, $369,579, and $289,736, respectively. In addition, NATCO provided trucking services for customers, such as Volkswagen, Subaru, Isuzu, and Chrysler, for whom NORAD and MAP provided unloading, processing, and marshaling services. For instance, NATCO's revenues from VW in 2001 totaled more than $522,000. *See, e.g.*, MAJ 3637, 3645, 3653, 3660–61. Substantially all of VSG's operating revenues for the relevant years are from trucking services VSG provided to the other Miranda companies.

In order to coordinate the services provided by the integrated Miranda companies, all of the inventory control functions of the companies were performed out of a single office at 100

Tidal Drive at the Davisville location. NATCO had no computer servers of its own to run database software to track inventory. Instead, NATCO used Access and Foxpro software running on NORAD's computer server to track inventory and deliveries. This was the same software, running on the same server, that NORAD and other Miranda entities used for the same inventory control purposes. From the York location, NATCO used a dial in service, PC Anywhere, to transfer database information to the computer in Davisville.

Support, administrative, and management functions were also centralized and integrated at the 100 Tidal Drive location, where employees performed the same functions for all of the Miranda entities. For example, the shared computer system at the 100 Tidal Drive offices was also used for accounting for all of the Miranda entities. Aldo Caputo, a NORAD employee, oversaw the accounting function for NORAD, NATCO, VSG, and MAP at that location. During 2001, NORAD and NATCO used the same outside payroll service to handle the payroll for both companies. Although NORAD and NATCO had separate phone lines, there was a single phone system and a single voicemail system at the 100 Tidal Drive offices that was shared by both companies. The office at 100 Tidal Drive was owned by NORAD on leased land, but NATCO paid no rent for its use of the space.

The degree of integration is also shown by the Miranda companies' financing transactions. During the relevant time frame, the Miranda entities applied for and obtained various term loans, lines of credit, and credit extensions which provided that NORAD, NATCO, MAP, and VSG were joint borrowers. Michael Miranda would sign on behalf of each of the companies, and would also personally guarantee the loans. *See*, *e.g.*, Conf. 281–833, 913–1607, 1608; T 14231, 14410. For example, NATCO and NORAD were co-borrowers in 2002 for a $2

Million secured term loan and a $1 Million secured line of credit even after NATCO had ceased its operations in York.

Likewise, the degree of integration is also shown by the Miranda companies' leasing transactions. Equipment leases entered by the Miranda entities during the relevant time period show that NORAD and NATCO (along with MAP and VSG) were joint lessees of the trucks and other equipment used in connection with the overall services provided by the Miranda companies. *See*, *e.g.*, Conf. 125, 131–52, 190–92, 205–25, 226–32, 253–62, 263–69, 270–78, 5261–62; T 14309–28, 14439–46, 14515–38, 14539–45, 14546–54, 17127–29. Miranda negotiated these leases on behalf of all of the joint lessees and signed as president of each of the Miranda companies. NORAD also guaranteed leases of NATCO and VSG. *See*, *e.g.*, T 10982, 14514. The Miranda companies also shared their lease expenses. *See*, *e.g.*, T 11843, 17346. Miranda testified that the reason the companies were joint lessees was because they would all mutually benefit from the leases, and share the use of the leased equipment.

In addition to such transactions with others, the Miranda companies also engaged in inter-company transactions that indicate a degree of integration that is not consistent with truly separate and independent businesses. The Miranda companies made numerous loans to and from one another during the relevant time frame. *See*, *e.g.*, T 1605–06, 10385–86, 17108–18, 17293–63, 17609, 18152–53, 18527–29. There was no formal policy for documenting the loans, but they were authorized by Michael Miranda. *See*, *e.g.*, T 16395. NORAD carried receivables from the other Miranda entities of more that a million dollars in both 1999 and 2000 and more than $600,000 in both 2001 and 2002. *See*, *e.g.*, T 10377, 11595, 16294. Despite these substantial receivables, there was apparently no formal note or repayment terms between the

companies. In addition to intercompany loans, the various Miranda companies also made personal loans to Miranda's sons. *See, e.g.*, Conf. 3692–94, T 11164.

During the relevant time frame, the Miranda companies used a large number of general ledger accounts to track intercompany transactions and allocate shared expenses and costs. *See, e.g.*, T 10385–90, 10082–87, 12357–64. NATCO's general ledger shows that many of the company's expenses were originally paid by NORAD and then allocated to NATCO by journal entry. For example, NORAD paid for insurance for NATCO, and both companies shared a single group health insurance plan for their employees. *See, e.g.*, Conf. 5817–25, T 10201–02, 11145, 13390. Other expenses that were shared in this manner included trucking supplies, truck and trailer upkeep, diesel fuel, transportation claims, dental insurance, employee life and disability insurance, shop supplies, classified ads, legal fees, consulting and professional services, telephone, freight, office expense, outside services, and interest. *See, e.g.*, MAJ 3665–86; T 1800, 1802, 1806, 1814, 1824–25, 1849, 1854, 1859, 1863, 1867, 1871, 1900, 1903, 1932–33, 1940, 1969.

Moreover, the nature of the intercompany transactions, particularly the management fees, further indicates that NORAD and NATCO were not operated as separate independent companies. According to its financial statements and tax returns, NATCO was paid management fees totaling some $170,000 during the years 1999–2001. *See, e.g.*, T 4, 10, 16. The management fees appear to have been determined and paid at each year end, but there was no written policy of formal method for determining the amounts. Thus, the management fees appear to reflect only a means of transferring money from one Miranda-owned company to another to serve Miranda's own interests.

obligations and loan obligations under the many joint loans and leases that the two companies had entered. Subsequently, NORAD negotiated with its lender to obtain a release of NATCO. *See* Conf. 1729, 1744. In 2002, NORAD took a "bad debt" deduction in the amount of $1,215,042 for the NATCO lease payments that NORAD had paid. *See*, *e.g.*, T 11115.

The timing of events also indicates NATCO's intent to avoid its labor obligations. NATCO stopped paying its York employees when Miranda knew that NATCO's contract with Subaru would come to an end October 2001. However, NATCO continued operating its trucking business with respect to the operations at the Davisville location until March of the following year. While NATCO refused to pay its York employees, NATCO continued to have revenues from its Davisville operations. Miranda knew that NORAD's operations would be continuing at Davisville, and he wanted to preserve good labor relations at the Davisville location. He had no such interest in the York location, and thus chose not to pay the union employees at York. According to financial statements and tax returns, NATCO generated profits in 2001 substantially in excess of the amount that would have been necessary to satisfy the York labor obligations, *see*, *e.g.*, T 1–6; MAJ 3215–57, but Miranda decided to ignore the grievance and allow defaults to enter against NATCO on the claim rather than paying the acknowledged obligation.

**Interrogatory No. 5**

Paragraph No. 18 of Defendants' Counterclaims contains the following allegation:

> NATCO was wrongfully rendered insolvent without regard to outstanding obligations to its employees under the CBA and that management and other expenses properly charged to other entities were allocated to NATCO, thereby rendering it insolvent.

State all facts upon which the allegations contained in paragraph No. 18 are based, including but not limited to:

a. the date and amount of each management expense allocated to NATCO but properly charge[able] to other entities including the identity of the company/person that the expense should have been allocated to and the amount which should have been allocated to that company/person; and

b. the identity, date and amount of every other expense allocated to NATCO but properly charge[able] to other entities including the identity of the company/person that the expense should have been allocated to and the amount which should have been allocated to that company/person.

**Response to Interrogatory No. 5**

In addition to the forgoing general objections, Defendants object that many of the facts that support the contention that management and other expenses were improperly allocated to NATCO are within the knowledge and control of the Miranda Entities, and Defendants' efforts to uncover these facts through discovery is ongoing. Subject to and without waiving these objections, Defendants state that NATCO's business operations abruptly ceased, with no apparent reason, after being a profitable enterprise in three of the four prior years. Thereafter, NORAD continued in business, serving the same market as NATCO had. NATCO failed to pay obligations due under the CBA, and through inter-company transactions with other companies that he controlled, Miranda emptied NATCO of any assets which might have been used to satisfy the unpaid CBA obligations. *See* MAJ 3074–138; MAJ 3288–508; MAJ 3634–86; T 1–18; T 413–5224; T 9724–15038; T 16020–508 Confidential 122–3607.

The various Miranda Entities booked substantial amounts for so-called "management fees" that were either payable or receivable between the Miranda-controlled companies. In discovery, Defendants have sought documents and information explaining the purposes of such management fees and how the various companies' expense allocations for these management fees were made, but Plaintiffs have not provided this information. *See* MAJ 3074–138; MAJ 3288–508; MAJ 3634–86; T 1–18; T 413–5224; T 9724–15038; T 16020–508 Confidential 1769–3607.

Details regarding the dates and amounts of management fees and other expenses referenced in Paragraph 18 of the Counterclaim can be determined from the general ledgers and other accounting and business records of the Plaintiffs themselves. Pursuant to Rule 33(d), Defendants direct Plaintiffs to those accounting and business records.

Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of the information obtained in discovery continues.

**Supplemental Response to Interrogatory No. 5.**

Answering further, NATCO's financial statements and tax returns show that NATCO generated profits in 2001 substantially in excess of the amount that would have been necessary to satisfy the York labor obligations, *see*, *e.g.*, T 1–6, 3215–57, which were incurred in 2001.