supervisory functions for the Miranda Entities can be determined from the Plaintiffs' own business records, and pursuant to Rule 33(d), Defendants direct Plaintiffs to these business records. *See* MAJ 3139–686; T 1–181; 413–9091; T 9724–15038; T 16020–508; Confidential 1–3607. Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of the information obtained in discovery continues.

**Supplemental Response to Interrogatory No. 6.**

Answering further, from 1999 on, NORAD and NATCO had identical management in the persons of Michael Miranda and Aldo Caputo. Beginning in 1999, Miranda was the sole shareholder of NORAD, NATCO, MAP, and VSG. Beginning in 1999, Miranda was also the president, treasurer, and sole director of each of the companies. Miranda served as the chief executive officer of all of the companies and exercised final decision making authority with respect to all policy level decisions at each of the companies.

Beginning in 1999, Aldo Caputo was the secretary of NORAD, NATCO, MAP, and VSG. Caputo served as the chief financial officer of each of the companies, and was responsible for overseeing all accounting, bookkeeping, and financial functions of each of the companies.

**Interrogatory No. 7**

Paragraph No. 20 of Defendants' Counterclaims contains the following allegation: "NATCO and NORAD have substantially identical business purposes. Both entities prepare, distribute, or transport automobiles." State all facts upon which the allegations contained in paragraph No. 20 are based, including but not limited to the following:

a. the identity of the parties for which NORAD distributed and/or transported automobiles;

b. the dates that NORAD distributed and/or transported automobiles including the point of origin and destination location and the company that received the automobiles; and

c. the identity of the parties for which NATCO prepared automobiles.

**Response to Interrogatory No. 7**

In addition to the forgoing general objections, Defendants object that many of the facts that support the contention that NATCO and NORAD have substantially identical business purposes are within the knowledge and control of the Miranda Entities, and Defendants' efforts to uncover these facts through discovery is ongoing. Subject to and without waiving these objections, Defendants state that NATCO and NORAD (along with other Miranda-affiliated companies) operated as a single business operation to accept deliveries of automobiles, off-load the automobiles from rail or ship, then prepare them, install accessories, and wash them, prior to distributing and transporting the automobiles to the various dealerships throughout the Northeastern United States for sale to customers. In conjunction with other Miranda-affiliated companies, such as MAP, the Miranda Entities performed these services for a common set of shared customers including Subaru, Volkswagen, Isuzu, and Chrysler. In some cases, different companies would perform separate tasks, such as the off-loading, prepping, storing, or transporting of the automobiles, but all of the companies operated as a single integrated business. *See* MAJ 3074–138; MAJ 3288–686; T 1–18; T 96–125; T 145–81; T 413–9091; T 9724–15038; T 16020–508; Confidential 1–3607. As described in the Responses to Interrogatories 2, 3, 5, and 6, above, the Miranda Entities shared and allocated expenses between them, shared leases and financing, had common management, had common facilities and equipment, and had identical ownership interests.

Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of the information obtained in discovery proceeds.

**Supplemental Response to Interrogatory No. 7.**

Answering further, each of the Miranda companies operated as an integrated part of a single business that operated with a single purpose. Specifically, NATCO performed essential trucking services that were part of the overall prepping, marshalling, and delivery services that the Miranda companies performed. While NORAD and MAP unloaded, processed, accessorized, and marshaled cars for their customers, NATCO provided the trucking services to transport the processed cars from NORAD's Davisville location and MAP's York location to dealers throughout the region. During the relevant times, NORAD processed and marshaled cars for Volkswagen, Subaru, and Chrysler, among others. With respect to Davisville, NATCO hauled cars for NORAD and for Volkswagen and Subaru. From Davisville, these cars would be delivered to the various Volkswagen and Subaru dealerships in the Northeast. MAP processed

and marshaled cars for Subaru and Isuzu, and from York, NATCO hauled cars for MAP, Subaru, and Isuzu. From York, these cars would be delivered to the various Subaru and Isuzu dealerships in the mid-Atlantic states and the Northeast. When necessary, NATCO would also transport cars from dealerships or auctions to the Davisville or York locations or between the Davisville and York. VSG also transported cars as part of the overall services that the Miranda companies provided.

The single business purpose can also be seen, for example, from the common sources of revenue for the various companies. A substantial portion of NATCO's revenues during the relevant time frame came directly from hauling cars for NORAD and MAP. For example, NATCO's trucking revenues from NORAD totaled $633,982 for 1999, $823,002 for 2000, and $581,882 for 2001. NATCO's trucking revenues from MAP during those years totaled $411,707, $369,579, and $289,736, respectively. NATCO's revenues from Volkswagen exceeded $522,000 in 2001 alone. NATCO's revenues from transporting Subarus, from both Davisville and York, totaled more than $5.3 Million during the years 1999–2001. *See, e.g.*, MAJ 3637, 3645, 3653, 3660–61. Substantially all of VSG's revenues during the relevant years were from trucking services it provided to the other Miranda companies.

**Interrogatory No. 8**

Paragraph No. 21 of Defendants' Counterclaims contains the following allegation:

> NATCO and NORAD have substantially identical operations. Both entities have the same address and were managed by the same staff from the same offices. Expenses such as payroll, trucking supplies, truck maintenance, diesel fuel, health insurance, dental insurance, shop supplies, classified ads, legal fees, consulting and professional services, telephone bills, freight costs, and office expenses were at all relevant times paid jointly by all employer entities without regard to which nominally separate entity actually incurred the expense.

State all facts upon which the allegations contained in paragraph No. 21 are based, including but not limited to:

a. the dates and locations of business addresses that were shared by NATCO and NORAD;

b. the relevant dates and identity of the individuals and departments that simultaneously managed NATCO and NORAD; and

c. the identity, date and amount of each expense including but not limited to payroll, trucking supplies, truck maintenance, diesel fuel, health insurance, dental insurance, shop supplies, classified ads, legal fees, consulting and professional services, telephone bills, freight costs, and office expenses that were paid jointly by all employer entities without regard to which nominally separate entity actually incurred the expense.

**Response to Interrogatory No. 8**

In addition to the forgoing general objections, Defendants object that many of the facts that support the contention that NATCO and NORAD have substantially identical operations are within the knowledge and control of the Miranda Entities, and Defendants' efforts to uncover these facts through discovery is ongoing. Subject to and without waiving these objections, Defendants state that NATCO and NORAD shared the business address of 100 Tidal Drive, North Kingstown, Rhode Island. Common management and employees included Aldo Caputo, Michael Miranda, Justin Miranda, Lance Miranda, Keith Miranda, James Gasper, Stu Tully, and John Huber.

As to examples of shared expenses, Defendants refer to, and incorporate herein, their Response to Interrogatory 2. Answering further, the details regarding the specific nature, amounts, and dates of individual expenses shared or allocated among the Miranda Entities can be adduced from Plaintiffs' own accounting and business records. *See* MAJ 3114–686; T 1–181; T 413–9191; T9724–15038; T 16020–508; Confidential 1–3607. Pursuant to Rule 33(d), Defendants refer Plaintiffs to those records. Defendant's review of the accounting and business records so far produced by the Plaintiffs is ongoing, and Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of the information obtained in discovery continues.

**Supplemental Response to Interrogatory No. 8.**

Answering further, Defendants refer Plaintiffs to Defendants' supplemental response to Interrogatory 1, above.

**Interrogatory No. 9**

Paragraph No. 22 of Defendants' Counterclaims contains the following allegation:

NATCO and NORAD share substantially identical equipment. In addition to using the same office space and office equipment, NATCO and NORAD have shared expenses for other equipment. Lease agreements for equipment establish that NATCO and NORAD, among other Miranda-owned entities, jointly entered into lease obligations and shared liability for leased heavy equipment, regardless of which nominally different entity actually used the equipment.

State all facts upon which the allegations contained in paragraph No. 22 are based, including but not limited to:

a. the identity and date(s) of all equipment shared by NATCO and NORAD;

b. the identity, date and amount of each expense that NATCO and NORAD shared for equipment; and

c. the identity of all lease agreements for equipment which were jointly entered into by NATCO and NORAD and/or other Miranda-owned entities including but not limited to the date of each such agreement.

**Response to Interrogatory No. 9**

In addition to the forgoing general objections, Defendants object that many of the facts that support the contention that NATCO and NORAD share substantially identical equipment are within the knowledge and control of the Miranda Entities, and Defendants' efforts to uncover these facts through discovery is ongoing. Subject to and without waiving these objections, Defendants state that as the Miranda Entities shared their management and had a shared business office in North Kingstown, Rhode Island, their office equipment at that location was shared by the companies. In addition, there were corporate vehicles that were used by the individuals who had managerial and supervisory functions at NATCO and NORAD. These corporate vehicles were thus used for the business of both companies. NATCO's equipment leases were signed by NORAD and/or Miranda individually; thus it also appears that trucking and other equipment were also shared. Moreover, it appears that at least some part of NATCO's equipment was sold to NORAD, or the leases assumed by NORAD, in conjunction with NATCO's closing its operations. *See* MAJ 3074–686; T 1–18; T 413–5224; T 9724–15038; T16020–508; Confidential 1–3607.

Answering further, details regarding the specific leases can be adduced from the leases themselves. Pursuant to Rule 33(d), Defendants refer Plaintiffs to the leases and Plaintiffs' own business records with respect to such matters. Defendants' review of the leases and related documents so far produced by Plaintiffs is still ongoing. Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of such information proceeds.

**Supplemental Response to Interrogatory No. 9.**

Answering further, NORAD and NATCO shared the offices at 100 Tidal Drive and the computer system, phone system, and other office equipment located at that address during the relevant time period. In addition, trucks and other operating equipment were jointly leased by NATCO, NORAD, and other Miranda entities. Details regarding the dates of the lease agreements and the specific equipment jointly leased under each agreement are contained in the joint lease agreements which have been produced. *See*, *e.g.*, Conf. 125, 131–52, 190–92, 205–25, 226–32, 253–62, 263–69, 270–78, 5261–62; T 14309–28, 14439–46, 14515–38, 14539–45, 14546–54, 17127–29. According to Miranda, other facilities, such as the carwash at the Davisville location were also shared for the mutual benefit of all of the Miranda companies. The details regarding the dates and amounts of shared expenses, lease payments, and loan payments are contained in NATCO's general journal. *See* Conf. 03411–607.

**Interrogatory No. 10**

Paragraph No. 23 of Defendants' Counterclaims contains the following allegation:

> NATCO and NORAD shared substantially identical customers. The vast majority of NATCO and NORAD's income came from the shared customers Volkswagen and Subaru. Additionally, substantial NATCO revenue came directly from NORAD and other Miranda-owned entities.

State all facts upon which the allegations contained in paragraph No. 23 are based, including but not limited to:

a. the amount of annual income that NATCO received from Volkswagen for the years upon which defendants rely;

b. the amount of annual income that NORAD received from Volkswagen for the years upon which defendants rely;

c. the amount of annual income that NATCO received from Subaru for the years upon which defendants rely;

d. the amount of annual income that NORAD received from Subaru for the years upon which defendants rely; and

e. with regard to NATCO revenue which came directly from NORAD and other Miranda-owned entities, identify the individual/ company that made such payment(s), the dates of the payments and the amount of the payments.

**Response to Interrogatory No. 10**

In addition to the forgoing general objections, Defendants object that many of the facts that support the contention that NATCO and NORAD shared substantially identical customers and especially the knowledge of the amounts of NATCO's and NORAD's annual income are within the control of the Miranda Entities, and Defendants' efforts to uncover these facts through discovery is ongoing. Subject to and without waiving these objections, Defendants state that the Miranda Entities shared such customers as Subaru, Volkswagen, and Isuzu. Chrysler was a shared customer of NORAD and MAP. Defendants incorporate herein their Response to Interrogatories 2 and 7. *See* MAJ 3074–138; MAJ 3288–686; T 1–181; T 413–5224; T 9724–15038; T 16020–508; Confidential 1–3607.

Although Defendants' review of NATCO's and NORAD's accounting and financial records (to the extent such materials have so far been produced) is still ongoing, it appears that NATCO's revenues from Volkswagen exceeded $522,000 in 2001 and exceeded $40,000 in 2002. NORAD's revenues from Volkswagen appear to have exceed $460,000 in 2001; $2.1 Million in 2002; $9.3 Million in 2003; and $8.5 Million in 2004. NATCO's revenues from Subaru appear to have exceed $1.5 Million in 1999; $1.9 Million in 2000; and $1.7 Million in 2001. NORAD's revenues from Subaru appear to have exceed $3.0 Million in 1999; $2.5 Million in 2000; $2.0 Million in 2001; $1.3 Million in 2002; $1.2 Million in 2003; and $1.5 Million in 2004. NATCO also appears to have received revenue from NORAD in amounts which exceed $623,000 in 1999; $823,000 in 2000; $581,000 in 2001; and $69,000 in 2002. In addition, substantial funds were paid between NATCO, NORAD, and other Mirada-affiliated companies in the form of so-called management fees and allocated expenses. NATCO also received revenue from "sales" to other Miranda-affiliated companies during this time. For example, NATCO appears to have received more that $1.0 Million in revenues from MAP during the years 1999 to 2001. *See* MAJ 3074–138; MAJ 3634–65; T 1–18; T 413–5224; T 98724–15038; T 16020–508; Confidential 1769–3387; Confidential 3411–607.

Answering further, Defendants refer Plaintiffs to their own financial and business records pursuant to Rule 33(d). Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of Plaintiffs' financial information obtained in discovery continues.

**Supplemental Response to Interrogatory No. 10.**

Answering more specifically, documents that indicate the sources of NATCO's annual revenues for the relevant years include MAJ 3637, 3645, 3653, and 3660–61. The documents

that indicate the sources NORAD's annual revenues for the relevant years include T 10082–87, 10385–90, 11122–28, and 13486–91.

In addition to the revenue NATCO received directly from NORAD during the relevant years (discussed above), NATCO also received trucking revenues from MAP in amounts of $411,707 in the year 1999; $369,579 in 2000; and $289,736 in 2001. *See* MAJ 3637, 3645, 3653, and 3660–61.

**Interrogatory No. 11**

State all facts upon which you base your contention that "NATCO and NORAD share identical supervision" as stated in paragraph No. 24 of Defendants' Counterclaims, including but not limited to the individual(s) who performed said supervision and the subject matter that each individual supervised.

**Response to Interrogatory No. 11**

Subject to and without waiving the foregoing general objections, Defendants state that Michael Miranda and Aldo Caputo were officers of both NATCO and NORAD, and they were the individuals who were in charge of supervisory functions for both NATCO and NORAD. Justin, Lance, and Keith Miranda also had certain positions and responsibilities within both companies. Their specific titles and the identity of other individuals employed to perform management or supervisory functions for the Miranda Entities can be determined from the Plaintiffs' own business records, and pursuant to Rule 33(d), Defendants direct Plaintiffs to these business records. *See* MAJ 3114–38; MAJ 3288–633; T 19–181; T 9724–15038; T 16020–508; Confidential 1–3410. Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of the information obtained in discovery continues.

**Supplemental Response to Interrogatory No. 11.**

Answering more specifically, documents that indicate that NATCO and NORAD shared identical management include tax returns, corporate filings with the secretary of states office, and accountants' workpapers which reveal that Michael Miranda was the president, treasurer, and sole director of NORAD, NATCO, MAP, and VSG after January 1, 1999, and also that Aldo Caputo was the secretary of all four companies during that time. Since January 1, 1999, Miranda served as the chief executive officer of all of the companies and exercised final decision making

authority with respect to all policy level decisions at each of the companies. Since January 1, 1999, Caputo served as the chief financial officer of each of the companies and was responsible for overseeing all accounting, bookkeeping, and financial functions of each of the companies.

**Interrogatory No. 12**

State all facts upon which you base your contention that "Miranda is also an alter ego of NATCO as that doctrine has developed under corporate law" as stated in paragraph No. 25 of Defendants' Counterclaims.

**Response to Interrogatory No. 12**

In addition to the forgoing general objections, Defendants object that many of the facts that support the contention that the Miranda Entities are alter egos of one another under corporate law doctrines are within the knowledge and control of the Miranda Entities, and Defendants' efforts to uncover these facts through discovery is ongoing. Subject to and without waiving these objections, Defendants state that the Miranda Entities displayed a unity of interest and a unity of stock ownership. NATCO was emptied of its assets and left without any means to satisfy its obligations under the CBA. The Miranda Entities had common management and officers and were operated with a common business purpose. They used common premises and equipment to serve common customers within the same geographic market. The Miranda Entities were also financially dependent upon one another; each relied upon the business and contracts of the others, and none were truly independent of the others. Miranda, as the common owner and a common officer of both NATCO and NORAD, dominated and controlled the respective companies finances, policies and practices. The nature of the dealings and transactions between the various Miranda Entities (and other Miranda-affiliated companies) were less than arms-length. The same owner and management were on both sides of the inter-company transactions, such as the exchange of so-called "management fees" between the companies and the allocations of payroll and employee benefits. The manner in which leases, equipment, and expenses were shared between the companies is also indicative of their interdependence and a lack of adherence to corporate formalities. Moreover, the timing of NATCO's cessation of operations indicates that a purpose of the transaction was to evade obligations to NATCO's creditors, particularly to Defendants. *See* MAJ 3474–3686; T 1–181; T 9724–15038; T 16020–16508; Confidential 1–3607.

Answering further, Defendants refer to and incorporate herein their responses to Interrogatories 13–15, below. Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of the information obtained in discovery proceeds.

**Supplemental Response to Interrogatory No. 12.**

Answering further, Defendants refer Plaintiffs to Defendants' supplemental response to Interrogatory 1, above.

In addition, Michael Miranda, negotiated the collective bargaining agreement between NATCO and Teamsters 430. Miranda made the decision for NATCO to neither defend nor appear at the arbitration or district court lawsuit subsequently brought by Teamsters 430 to enforce the terms of the collective bargaining agreement.

The unity of interest between Michael Miranda, individually, and the companies he owned is also demonstrated by Miranda's use of corporate assets for loans to himself and his family members and for other personal purposes. For example, the outstanding balance on personal loans that NORAD granted to Miranda was $532,466 at the year end in 2000; $608,528 in 2001; $695,676 in 2002; $746,667 in 2003; and $754,756 in 2004. *See, e.g.*, T 10494, 11114, 11122, 11166, 11595, 13565, 13571. There were no formal notes for these loans, and according to NORAD's accountants, the loans have no formal repayment terms. T 10377. Similarly, the outstanding balance on loans NORAD made to members of Miranda's immediate family totaled $42,193 as of year end 2002; $55,102 at year end 2003; and $79,300 at year end 2004. *See* T 11164, 13568, 11595. According to Caputo, at least some personal loans Miranda and his sons took from the Miranda companies have not been repaid.

In 2001 and 2002, accounting records show numerous personal vehicles being purchased or leased by NORAD. According to Caputo, these vehicles were bought or leased for the personal use of Miranda and his immediate family, but Aldo Caputo says that NORAD never issued W-2s reflecting the use of the vehicles as employment compensation. In 2001, leased vehicles included a Jaguar, a Toyota Tundra truck for use by Justin Miranda, a Toyota Tacoma

truck for use by Lance Miranda, a Lincoln LS, a Mercedes CLK 430C, and a Chevy K2500 Suburban. *See* T 10833, 10539, 10565. These leased vehicles were in addition to the Ford F650 and Dodge Ram 1500 trucks that NORAD purchased in 2001. *See* T 10616, 10619–23. In 2002, NORAD purchased a 2002 Cadillac Escalade, a 2002 Firebird, a 2003 Hummer, a 2003 GMC Sierra truck, and a 2003 Dodge Ram truck, while continuing to lease the Jaguar, Toyota Tundra and Tacoma trucks, and the Lincoln LS. *See* T 11215, 11210, 11253, 11231, 11412, 11454. That year NORAD also leased a 2003 Audi and a 2002 Mercedes CL50. *See* T 11231, 11412, 11454

NORAD's purchases and leases of numerous luxury vehicles continued throughout 2003 and until the present. For example, the company's 2003 purchases include a 2003 BMW, a 2003 Escalade, a 2003 GMC Sierra, a 2004 Dodge Ram truck, a 2003 Dodge Viper, a 2004 Lincoln Navigator, a 2003 Mercedes E55, a 2004 Mercedes CLK, and some ten other vehicles. T 14187–87. In addition to these vehicles, NORAD also leased a 2002 Mercedes CL500C, a 2003 Audi A6, a "new" BMW, a Lincoln Navigator, a 2003 Lincoln Aviator, a Jaguar XK8, an Acura NSX, and other vehicles in 2003. T 11718–20.

NORAD also purchased an $850,000 luxury yacht in 2004 from the Basset Boat Company. Later that year, NORAD traded the yacht in on an even bigger one that was purchased with a $1 Million loan from Washington Trust Bank that was secured by company assets. *See, e.g.*, 13612, 13635, 13644. Expenses for the yacht were paid by NORAD, and the yacht's captain was paid a salary as an employee of NORAD.

Miranda also used corporate assets for his personal entertainment, travel, and recreational expenses. For example, the entertainment expense account indicates that NORAD paid Miranda's food and entertainment expenses exceeding $41,000 in 2001; $54,000 in 2002;

$88,000 in 2003; and $131,000 in 2004. *See, e.g.*, T 10826–28, 11398–403, 11701–08, 13965–71. In addition to such amounts, NORAD also paid Miranda travel and expense allowances of more than $40,000 per year in 2001 and 2002 and an allowance of more than $32,000 in 2003. *See, e.g.*, T 10829, 11404, 11709.

The financial statements and tax returns for 2001 reveal that NATCO alone earned more than enough reported profits to fully satisfy the labor obligations owed to the union employees at the York location debt. *See* T 1–6, MAJ 3215–57. Miranda chose to continue paying NATCO's Davisville employees after operations in York ceased. Miranda used NORAD to pay NATCO's other liabilities arising out of, for example, ongoing lease commitments. However, despite the amount of cash that was apparently available for luxury cars, yachts, and entertainment, Miranda chose not to pay the money that was owed to NATCO's York employees.

**Interrogatory No. 13**

State all facts upon which you base your contention that, "Miranda controlled the operation of NATCO" as stated in paragraph No. 26 of Defendants' Counterclaims.

**Response to Interrogatory No. 13**

In addition to the foregoing general objections, Defendants object that this interrogatory is unreasonably duplicative. Subject to and without waiving these objections, Defendants refer Plaintiffs to Defendants' Response to Interrogatory 3 above, and incorporate that response, including its objections, into this response.

**Supplemental Response to Interrogatory No. 13.**

Answering further, Michael Miranda controlled the operations of NATCO, NORAD, VSG, and MAP at all relevant times. Beginning in 1999, Michael Miranda was the president, treasurer, and sole director of NORAD, NATCO, MAP, and VSG. As president and sole shareholder of each of these companies, Michael Miranda had final decision making authority with respect to all operational, financial, managerial, and labor matters at all of the Miranda

companies. Michael Miranda's signature on all of the pertinent lease agreements, customer contracts, and loan documents indicates that Miranda also exercised his authority with respect to all vital company matters. Certain low-level, non-union employees could be hired and fired by the various managers of the Miranda companies, but only subject to the conditions and policies established by Miranda himself. Michael Miranda was the person who made hiring and firing decisions with respect to the managers. The Miranda companies did not have separate written employee policies. Rather, all policies were set by Michael Miranda. With the assistance of the same counsel, Miranda was also the person who negotiated all collective bargaining agreements for all of the companies. Miranda was responsible for all decisions regarding how any of the companies responded to or handled grievances and other labor matters. Other than low-level decisions that could be made by individual managers, all of the decisions affecting the companies were made by Miranda.

**Interrogatory No. 14**

Paragraph No. 27 of Defendants' Counterclaims contains the following allegation:

> NATCO was at all relevant times insufficiently capitalized for the business purpose it undertook, not least paying the wages of its employees. NATCO operated on capital provided by Miranda or other Miranda-owned entities, or capital provided by loans secured by other entities, including NORAD. NATCO did not pay corporate dividends or observe other corporate formalities.

State all facts upon which the allegations contained in paragraph No. 27 are based, including but not limited to:

a. the identity of all corporate formalities that NATCO did not observe; and

b. the date and amount of all capital that NATCO operated on which was provided by Miranda or other Miranda-owned entities.

**Response to Interrogatory No. 14**

In addition to the forgoing general objections, Defendants object that many of the facts that support the contentions that NATCO was insufficiently capitalized and failed to obey corporate formalities are within the knowledge and control of the Miranda Entities, and Defendants' efforts to uncover these facts through discovery is ongoing. Subject to and without waiving these objections, Defendants state that corporate formalities that the Miranda Entities failed to observe included their commingling of assets and equipment, their sharing of expenses, their less-than-arm's-length transactions including inter-company "sales," and charging of so-called management fees, allocations of payroll and employee benefits, and so forth.

The amounts of capital provided by Miranda and other Miranda-owned entities as well as the dates such amounts were provided can be adduced from the financial statements and accounting records of the companies. *See* MAJ 3074–287; MAJ 3634–86; T 1–9091; T 9724–15038; T 16020–508; Confidential 1769–3607. Defendants' review of such materials is ongoing. Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of the information obtained in discovery proceeds.

**Supplemental Response to Interrogatory No. 14.**

Answering further, the Miranda companies did not follow corporate formalities with respect to intercompnay and officer loans because there were no formal notes for these loans, and according to NORAD's accountants, the loans have no formal repayment terms. *See, e.g.*, T 10377. In addition, the Miranda companies did not follow formalities with respect to the numerous intercompnay transactions between them and the sharing of equipment, facilities, expenses, and employees with out any formal written agreement or method for allocating such costs. From our review of the materials produced in discovery, it does not appear that Miranda or the other companies contributed any significant capital to NORAD. Instead, NORAD's operations appear to have been substantially financed through operations and revenues from NATCO, NORAD, and other Miranda entities.

**Interrogatory No. 15**

Paragraph No. 28 of Defendants' Counterclaims contains the following allegation:

NATCO's funds were siphoned off by Miranda and other Miranda-owned entities through excessive management fees, consulting fees, and other expenses wrongfully charged to NATCO.

State all facts upon which the allegations contained in paragraph No. 28 are based, including but not limited to:

a. the date, amount and payee of all funds that were siphoned off by Miranda and other Miranda-owned entities; and

b. the date, amount and payee of all excessive management fees, consulting fees, and other expenses wrongfully charged to NATCO.

**Response to Interrogatory No. 15**

In addition to the forgoing general objections, Defendants object that the details concerning the siphoning of funds and the payment of management and consulting fees and other expenses are within the knowledge and control of the Miranda Entities, and Defendants' efforts to uncover these facts through discovery is ongoing. Subject to and without waiving these objections, Defendants state that through inter-company "sales," charging of management fees, and allocations of expense between the various companies, Miranda effectively moved income and cash from NATCO to NORAD and/or other Miranda-affiliated companies for his own benefit. The precise dates and amounts of such transfers are reflected in the general ledger and accounting records of the respective companies. Plaintiffs have not produced all of the relevant accounting records for all of the Miranda-affiliated companies, and Defendant's review of the documents that have been produced so far is ongoing. *See* MAJ 3074–287; MAJ 3634–86; T 1–9091; T 9724–15038; T 16020–16508; Confidential 1–3607.

Pursuant to Rule 33(d), Defendants refer Plaintiffs to their own accounting and business records. Defendants will supplement this response to the extent required by the Federal Rules of Civil Procedure as Defendants' discovery efforts and Defendants' analysis of the information obtained in discovery proceeds.

**Supplemental Response to Interrogatory No. 15.**

Answering further, Miranda also drained capital from the Miranda companies though his use of company assets to purchase or lease automobiles for his and his family members' personal use, the purchase of the yachts, personal loans that have not been repaid, and exorbitant entertainment and travel expenses. In 2001 and 2002, accounting records show numerous personal vehicles being purchased or leased by NORAD. According to Caputo, these vehicles were bought or leased for the personal use of Miranda and his immediate family, but NORAD

never issued W-2s reflecting the use of the vehicles as employment compensation. In 2001, leased vehicles included a Jaguar, a Toyota Tundra truck for use by Justin Miranda, a Toyota Tacoma truck for use by Lance Miranda, a Lincoln LS, a Mercedes CLK 430C, and a Chevy K2500 Suburban. *See* T 10833, 10539, 10565. These leased vehicles were in addition to the Ford F650 and Dodge Ram 1500 trucks that NORAD purchased in 2001. *See* T 10616, 10619–23. In 2002, NORAD purchased a 2002 Cadillac Escalade, a 2002 Firebird, a 2003 Hummer, a 2003 GMC Sierra truck, and a 2003 Dodge Ram truck, while continuing to lease the Jaguar, Toyota Tundra and Tacoma trucks, and the Lincoln LS. *See* T 11215, 11210, 11253, 11231, 11412, 11454. That year NORAD also leased a 2003 Audi and a 2002 Mercedes CL50. *See* T 11231, 11412, 11454

NORAD's purchases and leases of numerous luxury vehicles continued throughout 2003 and until the present. For example, the company's 2003 purchases include a 2003 BMW, a 2003 Escalade, a 2003 GMC Sierra, a 2004 Dodge Ram truck, a 2003 Dodge Viper, a 2004 Lincoln Navigator, a 2003 Mercedes E55, a 2004 Mercedes CLK, and some ten other vehicles. T 14187–92. In addition to these vehicles, NORAD also leased a 2002 Mercedes CL500C, a 2003 Audi A6, a "new" BMW, a Lincoln Navigator, a 2003 Lincoln Aviator, a Jaguar XK8, an Acura NSX, and other vehicles in 2003. T 11718–20.

NORAD also purchased an $850,000 luxury yacht in 2004 from the Basset Boat Company. Later that year, NORAD traded the yacht in on an even bigger one that was purchased with a $1 Million loan from Washington Trust Bank that was secured by company assets. *See, e.g.*, 13612, 13635, 13644. Expenses for the yacht were paid by NORAD, and the yacht's captain was paid a salary as an employee of NORAD.

The manner in which the shares of David Friedman were redeemed also appears to have drained assets from the Miranda companies. Specifically, the consulting fee that was part of the agreement to redeem David Friedman's shares was disproportionately charged to NATCO as an expense.

**Interrogatory No. 16**

Identify each person whom you intend to call as an expert witness, stating:

a. His/her name, or other means of identification, address and telephone number;

b. His/her profession or occupation, and the field in which he/ she allegedly is an expert;

c. If he/ she has had a formal education in his field and, if so, state:

  i. The name and address of each school where he / she received special education or training in this field;

  ii. The dates when he/she attended each school;

  iii. The name and description of each degree he / she received, including the date when each was received, and the name of the school from which each was received; and

  iv. The title, publisher and date of publication of any books, papers, articles, publications on subjects in his/her field that he / she has written within the preceding ten years.

d. Whether he/she is self-employed, employed by someone else or associated as a partner;

e. Each address where he/she practiced or was employed;

f. The dates he/she was with each employer, if any;

g. The type of duty they performed with each employer;

h. The subject matter on which he/she is expected to testify;

i. The substance of the facts on which he/she is expected to testify;

j. The substance of the opinions and/or conclusions to which each expert is expected to testify and give a summary of the grounds upon which each expert bases his/her opinion;

k. The identity of all such cases in which he/she testified during the last four (4) years, including the name of each case, the court, and docket number of each case, the names of the attorneys representing the principal parties in each case, and the date(s) of such testimony;

l. The amount of compensation to be paid for his/her work and efforts in connection with this action; and

m. A description and date of each written report prepared by him/her.

**Response to Interrogatory No. 16**

In addition to the forgoing general objections, Defendants object to this interrogatory on to the extent that it seeks disclosure of trial preparation material or information that is protected by the attorney client privilege or attorney work product. Subject to and without waving these objections, Defendants have not determined who they will call as an expert witness in this case. Defendants will supplement this response in accordance with the Federal Rules of Civil Procedure.

**Supplemental Response to Interrogatory No. 16.**

Answering further, Defendants expect to call Lorraine Horton of L. Horton & Associates as an expert witness in this case. Ms. Horton is the president and owner of L. Horton & Associates. L. Horton & Associates is located at 99 Stonehenge Road, Kingston, RI 02881, and the company's phone number is (401) 782-2078.

Ms. Horton is an expert in the fields of accounting and forensic accounting, and she is a certified public accountant and a certified fraud examiner. Ms. Horton holds an A.A.S. from the University of Delaware (1974) and a B.S. in business administration and M.B.A. from the University of Rhode Island (1981 and 1994, respectively). Ms. Horton has published no books or articles in the past ten years.

Prior to forming L. Horton & Associates, Ms. Horton worked at Arthur Young & Co. in Providence, Rhode Island as an auditor from 1981 to 1983. She then served as the chief financial officer of the Marathon Group of companies in Providence from 1983 to 1985. In 1986, Ms. Horton taught accounting at the University of Rhode Island and at Bryant College. Beginning in 1987, Ms. Horton was employed as an accountant at Gaines Vollucci in Warwick, Rhode Island.

Ms. Horton is expected to testify regarding whether, from an accounting perspective, the various Miranda entities were operated as a single integrated business or as separate, independent businesses. She is expected to offer an opinion, based on her review of the accounting and financial data contained in the documents produced that NORAD, NATCO, MAP, and VSG operated as a single integrated business from 1999 through the time when NATCO ceased its operations. She is also expected to offer an opinion, from an accounting perspective, that Michael Miranda treated all of the companies as a single integrated business and that he commingled and used business assets of the respective corporations as if they were his personal assets. The basis for her opinion is the degree to which the Miranda companies shared expenses, assets, and employees; the centralization of administrative and support functions at the 100 Tidal Drive office; the number and nature of intercompany transactions between the Miranda companies; the extent to which the companies were customers of one another and shared other common customers; the common management and control of the companies; the common ownership of the companies; the use of corporate assets for the personal benefit of the companies' common owner; and other factors. Ms. Horton is also expected to testify as to facts that can be determined from her forensic review of the accounting, financial, and tax records of Michael Miranda and the various Miranda companies.

Ms. Horton has not testified at a trial within the past four years. She testified as an expert at a deposition in the case of Review Realty Corp. v. Historic Newport, L.P., Civil Action No. 06-177 pending in Newport County Rhode Island Superior Court on May 17, 2006.

In connection with her work in this case, Ms. Horton has been compensated on an hourly basis at her customary rate of $175 per hour.

Ms. Horton has not issued any written report regarding this case.

**Interrogatory No. 17**

With regard to the time(s), if any, that Local 430 or its agents or employees advised NORAD and/or Miranda that Local 430 was pursuing Miranda and/or NORAD to satisfy the financial responsibilities of NATCO including but not limited to the Judgment entered in C.A. 02-1461 in the United States District Court for the Middle District of Pennsylvania, identify:

a. the date of the communication;

b. the substance of the communication; and

c. the parties to said communication.

**Response to Interrogatory No. 17**

Subject to and without waiving the foregoing objections, Defendants state that as NATCO, NORAD, and Michael Miranda constitute a single employer and alter egos of one another, all were put on notice that each would be liable for the financial responsibilities of NATCO's breach of the CBA beginning at the time the CBA was signed. As a single employer and alter egos of one another, all Plaintiffs were on notice of their liability for NATCO's obligations at the time NATCO ceased its York, Pennsylvania operations and failed to make payments required under the CBA. Plaintiffs were put on notice when Teamsters 430 informed NATCO of the various grievances filed against NATCO between July 12 and November 9, 2001. Plaintiffs were put on notice when Teamsters 430 wrote to Miranda on November 30, 2001, requesting that NATCO pay the monies owed under the CBA.

As a single employer and alter egos, Plaintiffs were put on notice when they received and ignored Teamster 430's demand for arbitration. Plaintiffs were put on notice when they were informed of the May 22, 2003 arbitration decision.

As a single employer and alter egos, Plaintiffs were again put on notice when counsel for Teamsters 430 filed suit against NATCO in the United States District Court for the Middle District of Pennsylvania (the "Pennsylvania action"). On August 21, 2002, counsel for Teamsters 430 mailed a complaint in the Pennsylvania action, a notice of lawsuit, and a waiver of service to NATCO in accordance with the Federal Rules of Civil Procedure, but NATCO and