# Report

## To Little Medeiros Kinder Bulman & Whitney, PC

## In the matter of

## Teamster Local 430

### Background of Principal

I am the principal of L. Horton & Associates. This firm was engaged on May 19, 2005, by Little Medeiros Kinder Bulman & Whitney PC ("LMKBW") in the matter of North Atlantic Distribution, Inc., and Michael Miranda vs. Teamsters Local Union No. 430 et al., U.S. District Court for the District of Rhode Island C.A. No. 05-348 L.

A copy of my CV is attached to this report. In addition to years of public auditing experience as a CPA, I have been a CFE (certified fraud examiner) since 1995. That certification requires an applicant to have fraud-related experience and to pass a rigorous four-part examination in the subject areas of financial transactions, law, investigation, and criminology and ethics. To maintain my CPA and CFE certifications I am required to attend 40 and 20 hours respectively of approved training each year.

At Arthur Young & Co. (1981–1983) and Gaines Vollucci & Co. (1987–1994), I was a staff accountant and participated in audits and reviews of a variety of corporations and partnerships. An important part of any audit or accounting review is the examination of interrelationships between related parties. Related-party transactions and legal arrangements (such as the guaranteeing or co-signing of debt) must be disclosed in all financial statements prepared by a CPA. I frequently audited or reviewed such transactions during my years in public accounting.

While chief financial officer at Marathon Development Corp., I was responsible for overseeing the accounting and financing functions of more than ten corporations and limited partnerships, most of which were interrelated through ownership, financing, or business transactions. It was my responsibility to adhere to ethical, tax, and accounting rules in accounting for common management, physical space, financial transactions, and interrelationships between those companies.

I have taught Accounting Information Systems for eight years (from 1995 through 2001 at the University of Rhode Island and in 2005 at the Graduate School of Johnson and Wales University). This course covers accounting issues and how to develop and

---

maintain a accounting system that adequately and correctly accounts for all financial and managerial transactions of a business entity.

In the 15 years I have been doing accounting investigations at my own firm, L. Horton & Associates, I have worked on many cases dealing with issues similar to those involved in the present case. In R.J. MiGuel Services, Inc., et al. vs. Clean Serve, Inc., et al., (U.S. District Court for the District of Rhode Island, C.A. No. 94-0201T), I investigated the transfers of funds between the plaintiff and an affiliated party and was deposed as a expert witness. In Review Realty Corp. vs. Historic Newport L.P., et al., (R.I. Superior Court, C.A. NM-06-177), I was also deposed as an expert witness. In that case, I investigated complicated transactions between a general partner and related entities. Many of my cases for private parties have involved limited partnership disputes in which the independent standing of the partnership or company was a key element in determining whether the other investors or limited partners were treated fairly. In my 25 years as a CPA, I have had extensive experience in investigating interrelationships between business entities and determining whether transactions between parties are appropriate.

## Scope of the Engagement

In the present case, I was engaged by the Defendants in both a consulting role and to offer expert opinion testimony in accordance with the federal court's rules of evidence and procedure. Generally, I was engaged to review the accounting, business, and tax records, deposition testimony, and other evidence of the kinds that an expert in my field would customarily rely upon in order to make an assessment, from an accounting perspective, of the issues relevant to the "single employer" doctrine and to the labor and corporate law "alter ego" doctrines.

I have been advised that the "single employer" doctrine involves a consideration, as between two or more companies or individuals, of the following factors: the degree of integration or interrelation of business operations; the commonality of management; the centralization of control over labor relations; and the commonality of ownership. The labor-law "alter ego" doctrine entails consideration of the following factors: common management and ownership; common business purpose, nature of operations, and supervision; common premises and equipment; common customers; the nature, extent, and formalities surrounding inter-company transactions; and the purpose behind the creation or continuation of the "alter ego" companies.

I also understand that the corporate "alter ego" doctrine entails a review of the totality of the facts and circumstances and consideration of a variety of factors which include

unity of interest or stock ownership; under-capitalization or dissipation of assets; common management, officers, and directors; the relationship of financial support or dependence; one corporation's lack of substantial business contacts independent from those of the other; domination of finances, policies, and practices; lack of adherence to corporate separateness; and representations made to third-parties regarding the degree of corporate separateness.

Specifically, I was asked

- To review, organize, and manage the voluminous quantity of documents produced in discovery by Michael Miranda ("Miranda"), North Atlantic Transport Co. of Rhode Island, Inc. ("NATCO"), North Atlantic Distribution, Inc. ("NORAD"), other Miranda-owned companies, the respective companies' accountants, and others;

- To evaluate and analyze the documents, particularly those bearing on accounting issues, so as to determine the nature and extent of the inter-relationship and integration between Miranda, NATCO, NORAD, Vehicle Services Group of Rhode Island, Inc. ("VSG"), and Mid-Atlantic Processing, Inc. ("MAP"); and

- After assessing the degree of integration and the extent of the inter-relationships between Miranda and these four companies, to offer an opinion as to whether, from an accounting perspective, Miranda operated the corporations as a single integrated business or as separate, independent businesses during the time period from January 1999 to mid-2003 (hereinafter the "relevant period").

In connection with my engagement in this case, I was also asked to testify as Defendant's Rule 30(b)(6) designee with respect to certain factual issues, including issues that pertain to the operations and transactions of NATCO, NORAD, VSG, and MAP that I investigated during the course of my review and analysis.

---

## Materials Reviewed

In conducting my analysis, I have read or reviewed over 28,000 pages of documents produced by Miranda, the subject companies, and their accountants in discovery. Those documents include:

- General ledgers of the four companies (NATCO, NORAD, MAP and VSG), NATCO tax returns and internally-produced financial statements, and some NATCO bank statements and payroll records, and various invoices (produced in May and September, 2005)

- NATCO's 2003 general ledger and various financial statements, tax returns, and correspondence (produced in August 2005)

- Workpapers of Cayer Prescott Clune & Chatellier (produced in August 2005, and again in August 2006)

- Workpapers of Daniel J. Ryan, CPA (produced in August 2005)

- Various NATCO accounting records including journal entries, inter-company receivables, leases, corporate documents, and records and receipts of some specific NATCO expense accounts (produced in April 2006)

- Records of NATCO fixed asset leases, purchases and dispositions (produced in June 2006)

- Selected pages of the personal tax returns of Michael Miranda ("Miranda") and additional NATCO and NORAD accounting records and receipts (produced in July 2006)

In addition to the documents produced in discovery, I have read the pleadings in the case, attended the depositions of Miranda and his chief financial officer, Aldo Caputo ("Caputo"), and reviewed the transcripts of other depositions taken in discovery.

---

## Findings and Opinions

### Integration of Miranda Entities

During the relevant period, NORAD and NATCO, along with MAP and VSG (hereinafter referred to collectively as the "Miranda Entities"), were so completely integrated and interrelated that they were, as operated by Miranda, the equivalent of divisions of a single company. The entities have been operated as a single enterprise for the personal benefit of Miranda.

The factual bases for my opinion are as follow:

Subchapter-S corporations and pass-through of gains and losses

NATCO, NORAD, VSG, and MAP are all subchapter-S corporations that, after January 1999, were all wholly owned by Miranda. This fact is supported by the respective companies' tax returns, and was confirmed by the testimony given during the depositions of Michael Miranda and Aldo Caputo. As all four were wholly-owned S corporations, all gains and losses passed directly through to Miranda's personal tax return.

The Miranda Entities have identical officers and directors

Beginning in January 1999, Miranda was the president, treasurer, and sole director of NATCO, NORAD, VSG, and MAP. From January 1999 to the present, Aldo Caputo has been the corporate secretary of NATCO, NORAD, VSG, and MAP. The identity of the officers and directors of each of the corporations is shown by filings with the secretary of state, and confirmed by the deposition testimony given by Miranda and Caputo.

Related lines of business

Miranda, through his companies, was in the business of prepping, marshalling, and delivering cars to car dealerships. NORAD unloaded, processed, and accessorized cars at the facility in Davisville, Rhode Island and MAP unloaded and marshaled cars in York, Pennsylvania. NATCO provided the trucking services necessary to transport the unloaded cars from NORAD's Davisville location and MAP's York location to dealers throughout the region. When necessary, NATCO would also transport cars from dealerships or auctions to the Davisville or York locations or between Davisville

and York. VSG also transported cars using smaller car carriers for what Caputo termed "odd moves" as part of the overall services that the Miranda entities provided.

Shared corporate offices at 100 Tidal Drive

All of the Miranda Entities shared common office space at 100 Tidal Drive, North Kingstown, Rhode Island. According to Caputo's testimony and accounting records, NORAD owned the office, but neither NATCO, MAP nor VSG paid rent for their use of the office.

Caputo testified that, during the relevant period, all four Miranda-owned corporations shared a common computer server located at the 100 Tidal Drive location and shared the accounting and inventory/database software running on that server.

All companies also shared the telephone and voice mail system, office equipment, and office overhead expenses at the 100 Tidal Drive offices.

Centralization of executive functions

Beginning in January 1999, Miranda served as the chief executive officer of NATCO, NORAD, VSG, and MAP, and in that role, he ran all four companies. This is shown by Michael Miranda's signature on all of the significant customer contracts, leasing agreements, and financing agreements on behalf of all of the companies and confirmed by the testimony given during the Miranda and Caputo depositions.

Centralization of accounting functions and use of common outside accountants

During the relevant period, Caputo served as the chief financial officer of NATCO, NORAD, VSG, and MAP. In that role, he oversaw bookkeeping and accounting functions of all four companies. The books and financial records for all four Miranda Entities were kept at 100 Tidal Drive in Davisville where Caputo's office was located. The accounting software used by all four corporations ran on a computer server located at 100 Tidal Drive that was owned by NORAD. These facts were shown by Caputo's deposition testimony and the Rule 30(b)(6) deposition testimony of NORAD and NATCO.

During the relevant period, all outside accounting functions for the Miranda Entities were provided by the same accounting firm, Cayer Prescott Clune & Chatellier. This is shown by the corporations' respective tax returns and confirmed by the deposition testimony of Caputo.

Centralized control of labor relations

According to the deposition testimony of Miranda and Caputo, Miranda was the person who, with the same legal counsel, negotiated all collective bargaining agreements for all of the Miranda Entities. Miranda was ultimately responsible for all decisions regarding how any of the companies responded to or handled grievances and other labor matters.

Use of common lawyers

As indicated by the closing documents from the Miranda Entities' 1999 and 2002 joint loan transactions with Citizens bank, the individual corporations were not represented by separate counsel.

Indirect payment of officer's employment earnings

Miranda and Caputo testified that, during the relevant years, they were paid employment earnings only by NATCO and NORAD even though both officers performed substantial duties for MAP and VSG as well. Journal entries and W-2s indicate that both officers' employment earnings were paid by NORAD and that NATCO was charged via journal entry for a portion of each's salary. However, no such journal entries were made to reflect services either officer provided to MAP or VSG.

NATCO employees paid salaries and benefits by NORAD

According to journal entries, it appears that all of NATCO's administrative employees in Rhode Island, such as Stewart Tully ("Tully") who was NATCO's operations manager at Davisville, were paid by NORAD. During the relevant period, NATCO's administrative employees in Rhode Island were also carried on NORAD's group life and health insurance policies. For example, according to NORAD's August 2001 group insurance policy, NATCO employees are among the covered individuals. These include Miranda, Caputo, Tully, Scott Francis, and others. NORAD's coverage of NATCO employees was confirmed by the deposition testimony of Caputo.

Informal sharing of employees

As both NORAD and NATCO employees worked in the same office at 100 Tidal Drive, administrative employees of one company would sometimes perform work for the

other on an informal basis. For example, Miranda testified that Barbara Merolla, a NORAD administrative assistant, also answered phones and provided secretarial services to NATCO. Caputo testified that Jeff Anderson, a NORAD employee, also provided services to NATCO.

General ledger accounts to track inter-company transactions

During the relevant period, the general ledgers and trial balances of the Miranda Entities included an unusually large number of accounts to track inter-company transactions between NATCO, NORAD, VSG, and MAP and allocate shared expenses and costs. NATCO's general ledger shows that many of the company's expenses were originally paid by NORAD and then allocated to NATCO by journal entry.

Specifically, NORAD had 34 inter-company accounts in 1999, 24 such accounts in 2000, and 38 in 2001. In 1999, NATCO and VSG each had 22 inter-company accounts. The number of transactions recorded in these accounts is also unusually large, and further indicates that the four corporations operated in a manner inconsistent with truly separate and independent companies.

Loans to Miranda

Accounting records reflect that Miranda borrowed significant sums booked to NORAD without executing promissory notes or formally specifying repayment terms for the advances.

**NORAD Loans to Miranda**

| Year | Year-end balance |
|---|---|
| 1999 | 405,467 |
| 2000 | 532,466 |
| 2001 | 608,528 |
| 2002 | 695,676 |
| 2003 | 746,667 |
| 2004 | 754,642 |

---

The loans to Miranda do not include loans made to other members of Miranda's family in lesser amounts. The lack of promissory notes and formal repayment terms for these inter-company loans and loans to Miranda, indicates that Miranda operated the companies in a manner inconsistent with their being truly separate and independent companies.

Joint loans

When the Miranda Entities borrowed from third-party lenders during the relevant period, NORAD, NATCO, MAP, and VSG all borrowed jointly and severally as co-borrowers. Miranda personally guaranteed the loans.

- In December 1999, NORAD, NATCO, MAP, and VSG obtained, as co-borrowers, a $250,000 secured revolving line of credit and a $1,250,000 Small Business Administration guaranteed term loan from Citizens Bank ("Citizens"). Miranda signed the credit agreement, the credit note, the security agreement, UCC financing statements, and the other loan documents as president of each of the four corporations, and he also personally guaranteed the loan.

- In connection with the December 1999 transaction, all four companies were represented by the same legal counsel, McGovern Noel & Benik.

- According to the settlement sheet and Miranda's deposition testimony, the proceeds from the December 1999 transaction were used primarily for improvements to NORAD's auto body shop in Rhode Island.

- According to UCC statements, the December 1999 line of credit and term loan were secured by all assets of all four Miranda-owned corporations, including the car-hauling trucks and other equipment located in Davisville, Rhode Island, and York, Pennsylvania, that the Miranda Entities had jointly leased but were used in NATCO's operations.

- In October 2001, all four Miranda-owned corporations, as co-borrowers, obtained from Citizens Bank an increase in the December 1999 line of credit from $250,000 to $500,000. Michael Miranda signed the October 2001 loan modification agreement on behalf of each of the four companies.

- In July 2002, all four Miranda-owned corporations, as co-borrowers, a $1,000,000 revolving line of credit and a $2,000,000 term loan from Citizens. All four Miranda-owned corporations were joint borrowers on the loan and line

of credit even though by July 2002, NATCO, MAP, and VSG had all substantially ceased operations. Miranda signed the loan agreement, both promissory notes, the security agreement, UCC financing statements, and the other loan documents as president of each of the four corporations, and he also personally guaranteed the loan.

- In connection with the July 2002 transaction, all four companies and Miranda personally were represented by the same legal counsel, Holland & Knight.

- In connection with the July 2002 transaction, all four companies executed corporate resolutions indicating their intent to become parties to the loan even though NATCO, MAP, and VSG had all substantially ceased operations.

- Under the 2002 loan agreement, insolvency of any one of the Miranda Entities constituted an event of default, but the financial covenants specified that the debt service coverage ratio was to be computed as if all four of the Miranda-owned corporations were a single enterprise.

These loan transactions are shown by the respective loan closing documents and confirmed by the deposition testimony of Miranda and Caputo. At deposition, Miranda also testified that he intended such joint loans to mutually benefit all of the companies that co-signed the loans as joint borrowers.

<u>Joint leases of car-hauling trucks and other equipment</u>

According to Caputo's deposition testimony, NATCO based roughly ten to twelve car-hauling tractor-trailer trucks in Rhode Island and approximately six in York, Pennsylvania. During the relevant time period, NORAD, and sometimes MAP, jointly leased trucks and trailers along with NATCO and VSG even though only NATCO and VSG were purportedly using trucks in their operations.

- NORAD and NATCO, as joint lessees, entered a master equipment lease agreement with Citizens Leasing Corp. ("Citizens Leasing") in April 1995. Under Lease Schedule 001 to the 1995 master agreement, NORAD and NATCO agreed to jointly lease four car-hauling tractor-trailer trucks and related equipment for a term that ran through April 2000. Under Lease Schedule 002 to the 1995 master agreement, dated May 1998, NORAD and NATCO agreed to jointly lease two car-hauling tractor-trailer trucks and related equipment for a term that ran through May 2003. Under Lease Schedule 003 to the 1995 master agreement, dated December 2000, NORAD and NATCO agreed to

jointly lease a car-hauling tractor-trailer truck and related equipment for a term that ran through December 2005. Under Lease Schedule 004 to the 1995 master agreement, dated February 2001, NORAD and NATCO agreed to jointly lease a car-hauling tractor-trailer truck and related equipment for a term that ran through January 2006. Michael Miranda signed the 1995 master agreement and each of the subsequent lease schedules on behalf of both NATCO and NORAD.

- In December 2000, NATCO and NORAD, as joint debtors, also entered an additional security agreement with Citizens Leasing in which both Miranda-owned corporations granted a continuing security interest in their respective tangible and intangible assets.

- As NORAD and NATCO paid-off the Citizens truck lease, Citizens sold the leased trucks jointly to NORAD and NATCO. For example, bills of sale from November 2001 and September 2002 show that the trucks were sold to NORAD and NATCO jointly. Caputo testified that such trucks coming off of the lease would then be sold, and any gain on the trucks would go to NORAD.

- NORAD and NATCO, as joint lessees, entered a master equipment lease agreement with Chicago Truck Center ("Chicago Truck") in August 1996. Under that agreement, NORAD and NATCO agreed to jointly lease six car-hauling tractor-trailer trucks and related equipment for a term that ran through August 2001. Michael Miranda signed the 1996 master agreement and associated schedules on behalf of both NATCO and NORAD.

- In April 1999, the Miranda Entities entered a Truck Leasing Agreement with Associates Leasing, Inc. holding themselves out as "NORTH ATLANTIC DISTRIBUTION, INC. DBA VEHICLE SERVICES GROUP OF RI, INC." The lease was signed by Miranda. Miranda also signed delivery and acceptance certificates under the lease and many associated schedules as President of "NORTH ATLANTIC DISTRIBUTION, INC. DBA VEHICLE SERVICES GROUP OF RI, INC."

- In February 2002, NATCO, NORAD, VSG, and MAP, as joint lessees, entered a master equipment lease agreement with Citizens Leasing with respect to a $150,000 waste water treatment system to be located at 100 Tidal Drive. Michael Miranda signed the 2002 master agreement on behalf of each of the four corporations, and also personally guaranteed the lease.

The foregoing lease transactions are shown by the respective lease agreements and schedules. The lease transactions were also confirmed by the deposition testimony of Michael Miranda and Aldo Caputo. At deposition, Miranda also testified that that he regarded such joint leases as being mutually beneficial each of the corporations. After NATCO substantially ceased operations, NORAD began paying the joint truck leases.

NORAD guarantee and payment of NATCO, VSG, and MAP lease obligations

According to NORAD's financial statements, it guaranteed or was jointly liable for NATCO, MAP, and VSG lease obligations in total amounts exceeding: $1,081,000 in 1999; $971,000 in 2000; $887,000 in 2001; $371,000 in 2002; and $223,000 in 2003. After NATCO substantially ceased operations in 2001 and early 2002, NORAD continued to make monthly lease payments on the leases that NATCO and the other Miranda-owned corporations had co-signed.

NORAD's "bad debt" deductions and continued payment of other companies' obligations

At the end of 2002, NORAD took a "bad debt" tax deduction in the amount of $1,215,042 to write off inter-company receivables. This deduction allowed Miranda to offset income of NORAD that would otherwise be taxable to him. Notwithstanding its treatment of such sums due from the other Miranda-owned corporations after they substantially ceased operations, NORAD continued to make loan and lease payments on behalf of the other companies generating additional "bad debt" losses and deductions of $138,113 in 2003 and $112,512 in 2004.

Based on the Miranda Entities' tax returns, NATCO, MAP, and VSG did not take the debt forgiveness into income in 2002 or 2003, and Miranda personally benefited by expensing the bad debt amounts twice—once, on the returns of NATCO, MAP, and VSG as the expenses were incurred, and a second time on NORAD's returns with the bad debt deduction.

Shared insurance policies

With the exception of policies that were specific to NATCO or VSG trucking liability, the Miranda Entities all shared insurance policies. For example, NORAD's and NATCO's Rhode Island employees were covered under NORAD's group life and heath insurance policies and NORAD's workers compensation policy. The Miranda Entities used a spreadsheet to allocate insurance costs among the respective companies and

---

to Miranda's sons who purchased personal automobile insurance through the companies.

NORAD's detail general ledger of its accounts receivable from NATCO

This document (Caputo deposition exhibit 7) details numerous transactions between NORAD and NATCO which predominately involve charging NATCO for expenses incurred or paid by NORAD on NATCO's behalf. These include truck supplies, payroll, employee benefits, consulting fees, office expenses, and in certain cases what appears to be truck rental.

Other shared expenses

All of the Miranda Entities paid expenses that were incurred by other entities. These expenses would be paid by one entity and accounted for via journal entry as receivable from another entity. Examples include:

- Shared telephone and other utility bills
- Shared office expenses
- Shared petty cash funds (VSG had no petty cash account in York and drivers were reimbursed for their expenses by NATCO) (T 05408–10)
- NATCO billed MAP for expenses such as gasoline, employee benefits, electricity, water, auto expense, telephone, freight, travel, payroll, and other miscellaneous expenses (T 05445)
- Trucking supplies
- Truck and trailer upkeep
- Diesel fuel
- Employee benefits such as dental, medical, life, and disability insurance
- Shop supplies
- Legal fees

- Consulting and professional services
- Telephone
- Freight
- Outside services
- Interest

There were also other shared expenses, such as rent for the 100 Tidal Drive office and shared use of NORAD's computer server, that do not appear to have been booked or allocated between the Miranda Entities in any way.

Inter-company sales and interdependence on common customers

During the relevant period, NATCO and the other Miranda Entities derived a significant portion of their revenues from sales to or subcontracting work to one another:

- In 1999, approximately one-third of NATCO's revenues from operations came from NORAD and MAP. Of gross sales of just over $3,109,000 in 1999, NATCO derived more than $623,000 from NORAD and more than $411,000 from MAP.
- In 2000, approximately one-third of NATCO's revenues from operations came from NORAD and MAP. Of gross sales of just over $3,457,000 in 2000, NATCO derived more than $823,000 from NORAD and more than $369,000 from MAP.
- In 2001, more than one-quarter of NATCO's revenues from operations came from NORAD and MAP. Of gross sales of just over $3,238,000 in 2001, NATCO derived more than $581,000 from NORAD and more than $289,000 from MAP.
- In 2002, more than half of NATCO's revenues from operations came from NORAD. Of gross sales totaling just over $118,000 that year, more than $69,000 came from NORAD.
- In 2000 and 2001, substantially all of VSG's revenues from operations came from NATCO, NORAD, and MAP. Of approximately $293,000 in trucking

revenues earned by VSG in 2000, less than $4,000 came from sources other than NORAD, NATCO, and MAP. Of approximately $312,000 in trucking revenues earned by VSG in 2001, less than $500 came from sources other than NORAD, NATCO, and MAP.

- In 2002, all $29,585 of VSG's revenues from trucking operations came from NORAD and NATCO.

- At deposition, Caputo testified that when NATCO or VSG transported vehicles for NORAD or MAP, the Miranda Entities' common management used an informal "formula" to set pricing. Under this formula, the price was typically set at approximately 80% of the amount that NORAD or MAP would receive from its customer.

Apart from their inter-company sales to each other, the Miranda-owned corporations were also interdependent upon shared common customers:

- In 2001 and 2002, NORAD provided marshalling and prepping services for Volkswagen and its dealerships at the Davisville facility. In those years, NATCO derived trucking revenues of $522,918 and $40,838, respectively, from hauling vehicles for Volkswagen from the Davisville location. These revenues represent 16% and 35%, respectively, of NATCO's total revenues from operations in those two years.

- In 1999, 2000, and 2001, MAP provided marshalling and prepping services for Subaru, Isuzu, and their respective dealers at the York facility. In those years, NATCO derived trucking revenues of between $1,568,891 and $1,975,622 from hauling vehicles for Subaru from York. These sales to Subaru represent more than one-half of all NATCO sales in each of the years 1999–2001. In 1999 and 2000, NATCO derived $382,807 and $261,864, respectively, from hauling vehicles for Isuzu from York. These sales represent approximately 12% and 8%, respectively, of all NATCO sales in 1999 and 2000.

In tabular form, the annual revenues from trucking operations for NATCO and VSG were as follows:

**Analysis of NATCO Revenues from Trucking Operations**

| Source of Revenues | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| NORAD (incl. NADS) | 623,982 | 823,002 | 581,882 | 70,502 |
| MAP | 411,707 | 369,579 | 289,736 | |
| Volkswagen (Davisville) | | | 522,918 | 40,838 |
| Subaru (Davisville) | 12,875 | | | |
| Other (Davisville) | 97,325 | 25,632 | 915 | 6,772 |
| Isuzu (York) | 382,807 | 261,864 | 32,260 | |
| Subaru (York) | 1,568,891 | 1,975,622 | 1,775,551 | |
| Other (York) | 11,780 | 1,350 | | |
| Other | | | 33,998 | |
| **Totals:** | 3,109,366 | 3,457,048 | 3,238,260 | 118,111 |

**Analysis of VSG Revenues from Trucking Operations**

| Source of Revenues | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| NATCO | 24,920 | 40,977 | 11,175 | 89 |
| NORAD | 98,974 | 189,768 | 252,870 | 29,497 |
| MAP | 0 | 58,485 | 47,650 | |
| Other | 4,030 | 3,985 | 470 | |
| **Totals:** | 127,924 | 293,215 | 312,165 | 29,585 |

Management fees

During the relevant period, accounting records show that all of the Miranda Entities either paid management fees to or received management fees from the other entities. In many cases, a company would both pay and receive management fees in the same year.

**Inter-Company Management Fee Income**

| | NORAD | NATCO | MAP | VSG |
|---|---|---|---|---|
| 1996 | 0 | 80,698 | | |
| 1997 | 0 | 260,000 | 0 | |
| 1998 | 10,000 | 160,000 | 0 | 30,000 |
| 1999 | 440,000 | 60,000 | 0 | 50,000 |
| 2000 | 595,000 | 60,000 | 0 | 10,000 |
| 2001 | 322,500 | 50,000 | 0 | 0 |
| 2002 | 0 | 0 | 0 | |

**Inter-Company Management Fee Expense**

| | NORAD | NATCO | MAP | VSG |
|---|---|---|---|---|
| 1996 | 25,000 | 16,500 | | |
| 1997 | 224,000 | 132,000 | 70,000 | |
| 1998 | 140,000 | 16,500 | 70,000 | 0 |
| 1999 | 50,000 | 0 | 500,000 | 0 |
| 2000 | 0 | 0 | 665,000 | 0 |
| 2001 | 0 | 0 | 350,000 | 15,000 |
| 2002 | 0 | 0 | 0 | 0 |

The management fees appear typically to have been determined or adjusted at each year end. The companies have not produced any supporting materials that indicate what management services were provided or the methods for calculating the management fees. There was no written management contract between the

companies. I was not able to detect a correlation between sales or payroll expense and management fees charged between NORAD and NATCO. Thus, it appears that management fees were merely a mechanism for transferring money from one of the Miranda Entities to another.

Miranda's personal use and benefit of corporate assets

According to accountants' workpapers and financial statements, NORAD made personal loans to Miranda with no written documentation for the loans and no formal repayment terms. The total balance on such loans was approximately $532,000 in 2000, $609,000 in 2001, and $696,000 in 2002. In addition, Miranda's family members borrowed more than $42,000 from NORAD in 2002 and more than $55,000 in 2003.

According to accountant's workpapers, NORAD's list of fixed assets purchased or leased at company expense include, during 2001 to 2003, a large number of luxury vehicles, including Cadillac Escalade, a Dodge Viper, a GMC Humvee, three Harley Davidson motorcycles, and an $88,000 purchase from Arlington RV Sales. These vehicles would not appear to be of the type required to carry out the business of the four Miranda-owned companies. Moreover, according to Caputo, Miranda and his sons as well as Caputo used NORAD vehicles for their personal use, but the personal use of such vehicles was not reported as compensation on the W-2 forms issued by the four corporations.

- Vehicles leased or purchased in 2001 included an $88,000 Ford F650 (purchased from Arlington RV), a 2002 Dodge Ram 1500, a Jaguar, "Justin's [Miranda's son] Toyota Tundra truck," "Lance's [Miranda's son] Toyota Tacoma truck," a Lincoln LS, a Mercedes CLK 430C, and a 2001 Chevrolet K2500 Suburban.

- Vehicles leased or purchased in 2002 included a 2002 Cadillac Escalade, a 2002 Firebird, a 2003 Hummer, a 2003 GMC Sierra, a 2003 Dodge RAM, a 2001 Jaguar, a 2000 Toyota Tundra, a 2000 Toyota Tacoma, a 2000, Lincoln LS, a 2003 Audi, and a 2002 Mercedes CL50.

- Vehicles leased or purchased in 2003 included a 2003 BMW, a 2003 Cadillac Escalade, a 2003 GMC Sierra, a 2003 Dodge, a 2004 Dodge RAM, a 2003 Dodge Viper, a 2004 Lincoln Navigator, a 2004 Ford F150, a 2003 E55 Mercedes, a 2004 Mercedes CLK, a 2002 Mercedes CL500C, a 2003 Audi A6, 2003 Lincoln Aviator, a 2001 Jaguar XK8, and an Acura NSX.

NORAD's list of fixed assets also includes three yachts, purchased sequentially beginning shortly after NATCO, MAP, and VSG substantially ceased operations. Accounting records show that each of these yachts was financed, maintained and operated at NORAD's expense. The yacht captain is paid on NORAD's payroll, and the dockage, gas, and food expense for the yacht are paid by NORAD. No records were kept to track personal vs. business use of the corporate yachts, and the entire cost was deducted as business expense on NORAD tax returns despite Caputo's acknowledgement that NORAD's accountants advised that the IRS Code did not allow deductions for corporate yachts.

There are many instances in the accounting records of personal expenses for Miranda (or members of his immediate family) being paid by the Miranda-owned corporations. Examples include: a 1999 invoice for $18K of kitchen appliances, large landscaping equipment and nursery items purchased, personal loans to family members, auto insurance for family members purchased through NORAD, a $42K purchase from Elmwood Sports Center, and extraordinary restaurant expenses—NORAD's entertainment expenses were approximately $41,000 in 2001, $55,000 in 2002, and $89,000 in 2003.

<u>Discretionary nature of income and expense allocations</u>

As mentioned above, NATCO and VSG a substantial portion of their revenues from NORAD and MAP and the Miranda Entities' common management set the pricing for such sales. As such, the Miranda Entities' common management could, by setting inter-company pricing, significantly affect how income and revenues were allocated between the four corporations. In addition to the ability to set sales and shift income at will from one company to another, the common management of the Miranda Entities (*i.e.*, Miranda and Caputo) had discretion in choosing which of the companies' shared expenses would be charged to another company, and in what amounts. The management fees that were charged back and forth between the Miranda Entities could also be used to reallocate income in a like manner.

---

Redemption of Friedman shares, undercapitalization, and allocation of consulting expense

As of January 1999, the Miranda Entities redeemed all of David Friedman's shares in the companies, resulting in Miranda becoming the sole owner of all four corporations. Caputo testified that Miranda did not contribute capital to fund the redemption. Rather, the redemption was funded by debt and out of the Miranda Entities' operations.

According to the redemption agreement, the $350,000 redemption price was to be allocated: $300,000 for NORAD, $30,000 for NATCO, $15,000 for MAP, and $5,000 for VSG. In addition to the redemption price, the Miranda Entities contracted to pay Friedman consulting fees of $8,250 per month. Notwithstanding the allocation ratio of the redemption price, $6,250 per month of the consulting fees were charged, by the Miranda Entities' common management, to NATCO. The consulting fees continued to be charged to NATCO even after NATCO substantially ceased operations.

Continuity and Inter-company transactions after cessation of NATCO, MAP, and VSG operations

NATCO, MAP, and VSG all substantially ceased operations in late 2001 and early 2002, however all three continue to exist as corporations in good standing without any apparent business reason other than ongoing inter-company transactions, recorded as journal entries, between the non-operating companies and NORAD.

Miranda's personal payment of corporate obligations

Miranda wrote personal checks to satisfy obligations of the four corporations. For example, in November 2003 and June 2004, Miranda wrote personal checks in the amounts of $43,000 and $27,000 respectively in settlement of pension fund claims that had been asserted against NATCO and VSG. In 2003, 2004, and 2005, Miranda also wrote personal checks to the Rhode Island Division of Taxation to pay corporate taxes of NATCO, MAP, and VSG.

NATCO's Income in 2001.

According to its financial statements, NATCO's net income for 2001 was $62,495. According to its tax returns, NATCO had total income of $478,231, and ordinary income (after deductions) of $52,002 in 2001.

Communications with others as a single integrated business